164 F.Supp. 844 (1958)
MISSISSIPPI RIVER FUEL CORPORATION, a corporation, Plaintiff,
v.
Gustave F. KOEHLER, Defendant.
No. 10341.
United States District Court E. D. Missouri, E. D.
February 5, 1958.
William A. Dougherty, New York City, Christian B. Peper, St. Louis, Mo., for plaintiff.
Jerome Fink, Tax Division, Dept. of Justice, Washington, D. C., Wayne H. Bigler, Jr., Asst. U. S. Atty., St. Louis, Mo., for defendant.
HARPER, District Judge.
This is a suit for the refund of Federal income taxes for the years 1951 and 1952. There are two issues involved. The first concerns the deductibility of plaintiff's contributions to a trust in 1951 and 1952, and the second the alleged abandonment of an oil gathering line in 1952. Section 23 of the Internal Revenue Code of 1939, as amended (hereinafter referred to as Section 23), 26 U.S.C.A. § 23, sets out certain deductions which are allowed from gross income with respect to taxpayers.
With respect to the first issuethe contributions to the trustfor the most part the pertinent facts as to such were stipulated, and for that reason the court will not discuss in detail the facts. The trust plan set up by the plaintiff was a deferred compensation plan, and if the *845 plaintiff's contributions to the trust are deductible they would be deductible only under Section 23(p) of the Internal Revenue Code of 1939, as amended.
So, the question presented with respect to the contributions to the trust by the plaintiff is whether or not Section 23(p) provides for the deduction of the contributions made to a trust by the taxpayer during 1951 and 1952, pursuant to the deferred compensation plan which the taxpayer adopted in 1949. The trust was known as the "Mississippi River Fuel Corporation Savings Trust", and became effective January 1, 1950, for a three-year period. Since that time trusts for the same purpose, although not identical, were established for three-year periods, effective January 1, 1953, and January 1, 1956, respectively.
The trust in question provided that all employees of one year's service were entitled to participate in the plan in specified amounts, which amounts would be matched by the plaintiff, and after three years would be terminated with the employees receiving pro-rata the amounts paid in, plus accumulated earnings.
The trust further provided that any employee participating in the plan might withdraw at any time from the plan. A member so withdrawing, or a member who left voluntarily the employment of the company, or who was discharged for good cause (of which the company should be the sole judge), would thereupon receive the total amount of the member's payroll deduction in respect to the plan and would thereupon cease to be a participant in the plan. The amounts that were contributed by the plaintiff with respect to any such members remained in the fund and it was pro-rated among the members at the termination of the trust.
Subsection (p) of Section 23, which controls with respect to the first issue in this case, covers contributions of a taxpayer to employees' trusts or annuity plans and compensation under deferred payment plans. Section 23(p) (1) (A) deals specifically with pension trusts, 23 (p) (1) (B) with retirement annuities, and 23(p) (1) (C) with stock bonus or profit-sharing plans. Section 23(p) (1) (D) reads as follows: "In the taxable year when paid, if the plan is not one included in paragraphs (A), (B), or (C), if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid."
There is no contention by the taxpayer that this was a stock bonus, annuity, or pension plan, so for the trust to be deductible it has to fall within Section 23 (p) (1) (C), dealing with profit-sharing, or Section 23(p) (1) (D), under which deferred compensation would fall. The treasury regulations applicable to Section 23(p) (1) (C) (Treasury Regulations 111, Sec. 29.165-1), in part state: "Established and maintained by an employer to provide for the participation in his profits by his employees or their beneficiaries."
The plan in question does not mention profits, and the proof leads one to the conclusion that it had nothing whatever to do with profits. While it is true that in each of the years in question the taxpayer had a profit many times more than the contribution made to the trust fund, yet had it operated at a loss it would have been obligated under the plan to make the contributions. The testimony discloses that the plan was set up primarily for the purpose of employer-employee relationships, that the taxpayer's business was such that it had over $100,000 invested with respect to each employee, that in an effort to aid in employer-employee relations and to minimize the turnover of employees the plan was conceived, drafted and put into effect, that when the plan was published it was called a savings plan, and that one of its purposes was to encourage thrift among the employees.
The taxpayer was familiar with the fact that plans set up under Section 23 (p) were often submitted to the Internal Revenue Department and the form of such plan approved by that department *846 before the plans actually became effective. The taxpayer had prior to the time a trust was instituted with respect to its retirement plan had such discussions with the Internal Revenue Department before the plan was finally put into operation. The taxpayer, for an employer-employee relationship, put the plan in question into effect without regard to whether or not it was deductible, and the testimony discloses that when the Internal Revenue Department questioned the plan the taxpayer refused to change it to comply with the statutes and regulations, and stated in effect that it was a plan that had been devised for the employees and they intended to follow through with it since it had met with the general approval of the employees, regardless of whether or not it was a deductible item.
For the contributions to the plan to have been deductible the plan did not have to be a profit-sharing one, since Section 23(p) (1) (D) covered other forms of contributions by employers, but certainly any plan to fall under Section 23(p) (1) (C) with respect to profit sharing must limit the contributions to those from profit. As a matter of fact, under the plan the measure of taxpayer's contributions was based upon how much his employees contributed, and not whether any profit was made. The plan does not fall within Section 23(p) (1) (C).
Turning to Section 23(p) (1) (D), we find that it is a section dealing with plans that do not fall under either of Sections 23(p) (1) (A), (B) or (C), but that it provides that all other plans are deductible only if the employees' rights are nonforfeitable. If the employees' rights under the plan in question were nonforfeitable, the taxpayer's contribution would be deductible under this paragraph.
As previously outlined, under the plan the employees who withdrew voluntarily from the plan, or who left the employment of the company, or who were discharged for cause, received from the trust only those sums that had been deducted from their wages. It has been consistently held that the forfeitability referred to in Section 23(p) (1) (D) is forfeitability of the rights of the individual employee rather than the rights of the employees as a class. Lichter v. Commissioner, 17 T.C. 1111, affirmed 6 Cir., 201 F.2d 49; Wm. M. Bailey Co. v. Commissioner, 15 T.C. 468, affirmed 3 Cir., 192 F.2d 574; Times Publishing Co. v. Commissioner, 13 T.C. 329, affirmed 3 Cir., 184 F.2d 376.
In view of these decisions the employees' rights under the plan were forfeitable and the plan does not fall within Section 23(p) (1) (D).
The taxpayer's contributions to the trust in question did not come within Section 23(p), they are not deductible, and judgment will be for the defendant as to Counts 1 and 2 of the petition.
With respect to the alleged abandonment of an oil gathering line in 1952, the testimony disclosed that the line in question was constructed by the plaintiff in the latter part of 1950 at a cost of some forty odd thousand dollars. The line was used to carry gas from a well. In 1952, the well which supplied the gas line in question was plugged and the tap valve at the junction of the well in question and the main line was closed. The line has not been used since the tap valve was closed.
There was a Phillips Petroleum gas well some 2,000 feet from the line and Phillips Petroleum contacted the plaintiff about purchasing the gas from the well, but the plaintiff did not purchase the gas therefrom. The geologist's picture of the area was not a good one, and when the gas well was plugged and the line to which the well was hooked went bad, the plaintiff concluded that the field was no good and abandoned the line as far as its use was concerned. While it is true that the company could have realized a small amount from the salvage of the pipe in the line, in order to have done so it would have been necessary to secure permission from the Federal Power Commission for its removal, and in addition there might have been some liability with *847 respect to its actual removal insofar as the landowners were concerned. The end result would have been that the plaintiff would have realized less out of the salvage of the line than it would have cost to have secured the certificate from the Federal Power Commission, even disregarding potential liability to landowners.
The law is well settled and it is undisputed that a taxpayer is entitled to what is generally referred to as an "abandonment loss" when the taxpayer discards such assets permanently from use in its business. The 8th Circuit Court of Appeals in Helvering v. Jones, 120 F.2d 828, discusses the question of abandonment, and the court in Talache Mines v. United States, 9 Cir., 218 F.2d 491, in dealing with this problem, held that in an abandonment case there had to be an affirmative act indicating an abandonment and an intent to abandon. We are not dealing in this instance with ordinary property.
In order for the line to be removed permission had to be secured from the Federal Power Commission. Disregarding the exhibits that dealt with the salvage value of the line, the vice president of the plaintiff corporation, who had been with the company a number of years, and was an experienced engineer, knew from past experience that to dig up the line would result in costing the company money. I do not read the cases and statutes to require any more to be done under the circumstances in this case than was done. The valve to the line was closed, a part of the line had been ruptured, and while it had been repaired, the condition of the line was questionable. An offer had been made by Phillips to sell gas that could be put through the line, but the company had refused because they had come to the conclusion that the field was no good. To dig up the line would have cost the taxpayer.
The court is of the opinion that these factors, coupled with plaintiff's averred intentions, sufficiently met the requirements with respect to abandonment, and that the plaintiff is entitled to judgment on Count 3 of the petition.
Attorneys for the defendant will prepare the findings of fact, conclusions of law and judgment and submit same to the court for entry.