## MISSISSIPPI RIVER FUEL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42856. Filed March 31, 1958.

*Christian B. Peper, Esq.*, and *William A. Dougherty, Esq.*, for the petitioner.

*David Karsted, Esq.*, for the respondent.

PIERCE, *Judge:* Respondent determined a deficiency in petitioner's income tax for the year 1949 in the amount of $4,028.89; and a deficiency in its income and excess profits tax for the year 1950 in the amount of $28,915.69. The petitioner, in its petition to this Court, challenged these deficiencies and alleged that said taxes were overpaid in the amounts of $7,305.70 and $305,904.51, respectively. Thereafter the respondent, in an amended answer to the petition, raised a new issue respecting the year 1950, and requested that an additional deficiency in income tax for said year be determined in the amount of $45,283.11.

Prior to the trial, all issues raised by the pteitioner in respect of the notice of deficiency were settled by stipulation of the parties (stipulation A). Effect will be given to such stipulation in the computations to be made herein under Rule 50.

The sole remaining issue for decision is that raised by respondent in his amended answer, to wit: Whether amounts totaling $89,190 which petitioner paid into a certain trust in 1950, pursuant to a so-called savings plan for its employees, qualify for deduction from its gross income for said year under section 23 (p) of the Internal Revenue Code (1939).

### FINDINGS OF FACT.

Several of the facts regarding the present issue have been stipulated. The stipulation (stipulation B), together with the exhibits attached thereto, is incorporated herein by reference.

Petitioner is a corporation organized under the laws of the State of Delaware, with its principal office at St. Louis, Missouri. At all times material, it kept its books and filed its returns in accordance with an accrual method of accounting, and on the basis of calendar years. Its income tax return for the year 1949, and also its income and excess profits tax returns for the year 1950 were filed with the then collector of internal revenue for the first district of Missouri, at St. Louis.

Petitioner was engaged in the sale of natural gas to utilities and industries; and it also owned and operated a gas pipeline extending from Texas into Missouri and Illinois. The amounts of its capital stock, surplus, and undivided profits, as of beginning and end of the year 1950, were as follows:

|  | Beginning of taxable year | End of taxable year |
|---|---|---|
| Capital stock | $15,479,572.50 | $26,290,720.50 |
| Paid-in or capital surplus | 153,003.50 | 153,003.50 |
| Earned surplus and undivided profits | 4,035,671.39 | 3,932,882.91 |

The total number of its employees (determined as of the end of quarterly calendar periods) ranged from 460 to 558 for the year 1950; from 557 to 670 for the year 1951; and from 566 to 598 for the year 1952.

The amounts of its net taxable income, as reported on its returns for the years 1949 through 1952 (which the parties have agreed will not vary greatly when finally determined), were:

| | |
|---|---|
| 1949 | $4,030,996.98 |
| 1950 | 8,326,576.33 |
| 1951 | 8,937,856.91 |
| 1952 | 7,100,084.07 |

At a special meeting of petitioner's board of directors held on November 3, 1949, a plan was presented for the creation of a so-called savings plan for its employees. The minutes of the meeting, relating to such plan, were as follows:

The President presented and explained to the meeting a Savings Plan, which he proposed to inaugurate on January 1, 1950. He stated that the maximum cost to the Corporation, exclusive of the fee of the Trustee and allocable accounting expenses, would be $90,000 per year, or 6.6% of the payroll of regular employees, and that it was estimated that the probable cost would approximate $76,500 per year, or 5.6% of the payroll of regular employees.

After discussion and upon motion duly made and seconded, the following resolutions were unanimously adopted:

RESOLVED, That the officers of this Corporation be and they are hereby authorized to create an Employees' Savings Plan, conforming substantially to the plan described in the memorandum submitted to this meeting; and

FURTHER RESOLVED, That the President or any Vice President be and he is hereby authorized in the name and on behalf of this Corporation to execute and deliver to the Trustee named therein, an Agreement which effectuates said plan; and

FURTHER RESOLVED, That the form of Agreement as executed and delivered shall have the prior written approval of the General Counsel of the Corporation; and

FURTHER RESOLVED, That the Treasurer be and he is hereby authorized and directed to pay to the Trustee named in said Agreement the sums required to be paid by the Company under the terms of said Agreement.

Thereafter, on November 17, 1949, a letter was issued by petitioner to its employees, which read:

TO THE EMPLOYEES:

On January 1 this Company will establish a Savings Plan for the employees. A booklet giving the full details of the Plan will be mailed to you as soon as it can be prepared and printed, but a short description of the Plan is given below.

1. Any employee who has completed one year of service may join.

2. Such member may contribute either $5.00, $10.00, $15.00, $20.00 or $25.00 per month.

3. The Company will contribute an equal amount and deposit the total with a bank as trustee.

4. The Plan will continue for three years at the end of which time the trustee will send each member the amount due him (less Federal Withholding Tax on the the Company contribution).

As an illustration, an employee contributes $25.00 per month for three years.

| | |
|---|---:|
| Employee Contribution (36 months × $25.00) | $900.00 |
| Company contribution | 900.00 |
| Total | $1,800.00 |
| Withholding tax (estimated) | 101.30 |
| Employee will receive | $1,698.70 |

When the employee receives the money at the termination of the Plan, it is his to do with as he wishes.

The Savings Plan is established with the hope that it will add to the security of the employees and their families through the medium of an orderly method of saving.

Kindest regards.

/s/ W. G. Marbury
WILLIAM G. MARBURY,
*President and Manager.*

Subsequently, as suggested in said letter, a printed booklet entitled "Savings Plan Effective January 1, 1950," was distributed to the employees. This booklet contained an introductory statement addressed to the employees; a description of the provisions of the savings plan; and a copy of the trust agreement under which all contributions to be made by petitioner and by participating employees were to be held by the trustee. Said introductory statement read as follows:

TO THE EMPLOYEES:

On behalf of the Board of Directors I am pleased to offer the Savings Plan which is described in the following pages of this booklet.

This Plan is established with the hope that it will add to the financial security of employees and their families through the medium of an orderly method of saving. We feel that whatever contributes to the security of the employee and his family also contributes to the welfare of the Company.

Sincerely yours,

W. G. MARBURY
*President and Manager*

The description of the savings plan contained in said booklet was as follows:

I. Eligibility:

All employees who on January 1, 1950 are credited with one or more years of continuous service are eligible to become a member in the Savings Plan on that date. All employees who on January 1, 1950 are credited with less than one year's continuous service, and those engaged or re-engaged thereafter, shall become eligible to become a member on the first of the month following completion of one year's continuous service, if then actively at work. Employees who are on the inactive list when they are otherwise eligible, will become eligible immediately upon their return to active service.

II. How to Join:

Participation in the Savings Plan is entirely voluntary. Any eligible employee may become a member in the Savings Plan by authorizing the Mississippi River Fuel Corporation (hereinafter called the Company) to make deductions each month from the current compensation due such employee from the Company. The Company shall be authorized to pay over such deductions, together with the Company contribution, to a banking corporation, as trustee, selected by the Company.

III. Members Deductions:

The amount which each member may contribute to the Plan shall not exceed $25.00 per month. Any lesser amount that the member may choose to contribute shall be in multiples of $5.00; that is, he may contribute each month either $5.00, $10.00, $15.00, $20.00, or $25.00.

IV. Company Contribution:

The Company will pay to the Trustee an amount equal to each member's monthly payroll deduction.

V. Term Of The Plan:

The Savings Plan will commence on January 1, 1950 and shall terminate on December 31, 1952 or at such earlier time as the Board of Directors of the Company shall designate.

VI. Rights Of Members:

A. On Termination Of the Plan

Each member who participates in the Plan until its termination shall receive:

(1) The total amount of that member's payroll deductions in respect to the Plan, plus—

(2) An equal sum contributed by the Company, plus—

(3) A pro rata share of the Company contributions, if any, that shall remain in the Savings Plan Fund due to withdrawals of members in accordance with Par. E of this section.

B. Members laid off, disabled, or retired prior to the termination of the Plan.

A member who shall be permanently laid off for no fault of his own or shall leave the service of the Company on account of disability or for other sufficient cause, of which the Company shall be the sole judge, or who shall be retired under the Company's Retirement Plan, shall thereupon receive—

(1) The total amount of that member's payroll deductions in respect to the Plan, plus—

(2) An equal sum contributed by the Company.

Such member shall thereupon cease to be a participant in the Savings Plan.

C. Members Withdrawing Or Discharged

Any member continuing in the employ of the Company may withdraw at any time from the Savings Plan. A member so withdrawing, and a member who leaves voluntarily the employment of the Company or who is discharged for good cause, of which the Company shall be the sole judge, shall thereupon receive—

(1) The total amount of that member's payroll deductions in respect to the Plan.

Such member shall thereupon cease to be a participant in the Savings Plan.

D. In Case Of Death

In case of the death of a member there shall be paid to his estate—

(1) The total amount of that member's payroll deductions in respect to the Savings Plan, plus—

(2) An equal sum contributed by the Company.

E. Fund Remaining After Withdrawals.

The Savings Plan Fund shall be exclusively for the benefit of the members. All amounts remaining in the Fund at the termination of the Plan which represent Company contributions made for the account of former participants who have ceased to be members and to whom such amounts have not been paid, shall be prorated among the members at the termination of the Plan as described in Par. A (3) of this section.

F. Assignment

The right or interest of a member in the Savings Fund shall not be subject to assignment or transfer.

### G. Attachment

If the interest of any member in the Savings Fund shall be levied upon by any legal writ, thereupon such member shall cease to be a member in the Savings Plan and shall have no right or interest in or under the Savings Plan or Savings Fund excepting only the total amount of the payroll deductions theretofore made on account of said member.

### H. Satisfaction Of Claims

Payments in accordance with Paragraphs A, B, C, D, and G of this section shall be in full payment and satisfaction of all claims hereunder against the Savings Fund, the Trustee, and/or the Company.

### VII. Expense Of The Plan:

The compensation of the Trustee in the administration of the Fund shall be paid from the earnings, if any, of the Fund, provided that if said earnings are insufficient to pay this compensation it shall be correspondingly reduced.

The expenses of collecting and distributing amounts' from and to the members and keeping the records with respect to the Fund will be borne by the Company.

### VIII. Trustee:

The trustee, to be selected by the Company, shall be a banking corporation which is a member of the Federal Reserve System. Said Trustee shall be authorized to invest the Fund in securities of the United States Government or in securities guaranteed by a governmental agency, the maturity dates of which shall be prior to the date of termination of the Savings Plan.

### IX. Modification Of The Plan:

The Company hopes and expects that this Plan will continue as described above until its termination on December 31, 1952, but necessarily reserves the right to modify, suspend, or discontinue it at any time. No such change, suspensions, or discontinuance will be retroactive and no right or interest in the Fund having then accrued to the member shall be affected thereby.

### Appendix

Estimated amounts to be received by members in the Savings Plan at the allowable rates of contribution for the full duration of the Plan.

| Monthly Rate of Contribution | Total Employee Contribution | Total Company Contribution | Total [1] |
|---|---|---|---|
| $5.00 | $180.00 | $180.00 | $360.00 |
| 10.00 | 360.00 | 360.00 | 720.00 |
| 15.00 | 540.00 | 540.00 | 1,080.00 |
| 20.00 | 720.00 | 720.00 | 1,440.00 |
| 25.00 | 900.00 | 900.00 | 1,800.00 |

[1] Subject to withholding tax upon the Company contribution.

On January 4, 1950, the trust agreement to effectuate the plan, the terms of which were fully set forth in said booklet for the employees, was executed by petitioner and by the Mercantile-Commerce Bank & Trust Company of St. Louis, as trustee. The preamble of said agreement read:

WITNESSETH:

THAT WHEREAS Mississippi River Fuel Corporation is desirous of providing for certain of its employees a practical method of saving, and

WHEREAS to accomplish that purpose the savings plan embodied herein has been formulated.

Now THEREFORE, in consideration of the premises and the material covenants herein contained, the parties hereto agree as follows:

The other provisions of said trust agreement may be summarily described as follows:

Article I—This provided that the trust should be known as the Mississippi River Fuel Corporation Savings Trust.

Article II—This contained definitions of various terms used in the agreement.

Articles III through XI—These articles contained descriptions of certain principal provisions embodied in the plan pertaining to eligibility for participation; manner of applying for membership; restriction on use of the trust fund to the exclusive benefit of the participants; contributions to be made by participants and petitioner; monthly payments to trustee of participants' payroll deductions and petitioner's contributions; inalienability of benefits; information to be supplied to the trustee respecting lists of participants and changes therein; allocation of benefits to accounts of participants; and distributions from the trust to participants.

Article XII—This provided, in substance, that investments by the trustee should be limited to securities issued by or guaranteed by the United States, of which the maturity dates should be on or prior to December 31, 1952.

Articles XIII and XIV—These articles made provision for compensation of the trustee, and for resignation and removal of the trustee.

Article XV—This provided that the trust would commence on January 1, 1950, and would continue for 3 years until December 31, 1952. It also reserved to petitioner the right by majority vote of its board of directors to amend, suspend, or terminate the trust, on any date prior to December 31, 1952; provided, however, that any such action would not be retroactive and would not affect any accrued right or interest of any member; and provided further, that in the event of termination prior to December 31, 1952, petitioner should direct the trustee to make distribution to the then participants within 30 days after the date of termination.

Articles XVI and XVII—These articles provided for payment of any taxes imposed upon the trustee, and defined the extent of the trustee's liability.

Article XVIII—This provided, in substance, that nothing in the agreement should be deemed to give any participant or employee the right to be retained in petitioner's employ, or any interest in any specific property of the trust, or any interest other than his right

to receive payment in accordance with the provisions of the agreement.

None of any of the above-mentioned instruments employed the term "profit sharing," or made any reference to profits of the petitioner.

Said savings plan (herein called the 1950 savings plan) became effective on January 1, 1950; and both it and the above-mentioned trust remained in force and effect throughout the years 1950, 1951, and 1952. During said period, both the plan and the trust were operated in accordance with their terms and provisions.

On at least 1 day of each calendar quarter of each of said years, the number of participants in said 1950 savings plan was more than 70 per cent of petitioner's total employees, after exclusion of (a) those who had been employed for less than 1 year, (b) those whose customary employment was for not more than 20 hours in any 1 week, and (c) those whose customary employment was for not more than 5 months in any calendar year. The number of participating employees at the end of each quarterly calendar period, ranged from 293 to 315 in the year 1950, from 325 to 383 in the year 1951, and from 394 to 416 in the year 1952. The percentage of eligible employees who were participants at the end of each quarterly period ranged from 89.2 per cent to 97 per cent.

During the years 1950, 1951, and 1952, petitioner accrued on its books and paid into said trust, in accordance with the terms of the plan and the trust agreement, monthly contributions in the amounts of $89,190 for the year 1950, $104,625 for the year 1951, and $123,855 for the year 1952. The parties have stipulated that said contributions "constituted compensation and, with respect to each employee for whom a contribution was made, this additional compensation, plus all other compensation paid or accrued to the employee, constituted reasonable compensation for the services actually rendered by that employee during the period for which the contribution was made."

The parties have further stipulated that the total of said contributions made by petitioner to such trust in 1950, 1951, and 1952 did not exceed 15 per cent of the compensation otherwise paid or accrued in those years to all employees participating in the savings plan during said years or any portion thereof; and that the total contributions made by petitioner in said years to all pension, profit-sharing, stock bonus, and annuity plans or trusts did not exceed 25 per cent of the compensation otherwise paid or accrued in those years to all employees participating in such plans or trusts during those years or any portion thereof.

On December 31, 1952, said 1950 savings plan terminated in accordance with its provisions; and on January 2, 1953, the trustee, acting in accordance with the terms of the trust agreement, distributed all exist-

ing corpus and accumulated income of the trust to the then remaining participants. The number of such remaining participants was 416; and the total amount so distributed to them was $616,963.

On November 22, 1952, which was shortly prior to the termination of the 1950 savings plan, petitioner's president announced at a company dinner which was attended by a number of petitioner's employees, that the company was prosperous, that the employees had done a good job, and that he intended to recommend to the board of directors that petitioner go ahead with the savings plan for another 3 years. This was the first time that the employees had been given such information. Thereafter, at a meeting of petitioner's board of directors held on November 24, 1952, resolutions were adopted, which authorized the officers to inaugurate for a period of 3 years beginning on January 1, 1953, a savings plan substantially the same as that established on January 1, 1950. As the result, formal announcement of such plan (herein called the 1953 savings plan) was made to the employees; a new trust agreement, in substantially the same form as that for the 1950 savings plan, was executed with the same trustee; a new booklet which was substantially the same as that used in connection with the 1950 savings plan was distributed to the employees; and new application forms for membership were distributed for execution by any eligible employees who desired to become participants. This 1953 savings plan became effective on January 1, 1953, and continued in force and effect throughout the years 1953, 1954, and 1955. It then terminated, in accordance with its provisions, on December 31, 1955; and distribution of the trust assets was made to the then remaining participants.

On November 1, 1955, petitioner's board of directors adopted another resolution, by which they authorized the operation of a similar savings plan for another 3-year period, beginning on January 1, 1956. This plan (herein called the 1956 savings plan) and the trust agreement executed in connection therewith, were put into effect through procedures similar to those previously employed. The provisions of such 1956 savings plan were substantially the same as those of the corresponding prior plans, except: (1) The trustee was a different bank; and (2) the rights of participants were changed, so as to make the interests of such participants in the contributions of petitioner, *nonforfeitable* at all times and in all events. Article XI of the trust agreement for said 1956 savings plan provided specifically, in part: "[I]t being the intent hereof that the interest of each participant in his own and the Corporation's contributions made during his participation herein shall in all events be vested and nonforfeitable."

Prior to petitioner's inauguration of its 1950 savings plan which is here involved, and also at all other times here material, petitioner had in operation a separate retirement plan for its employees, under which

retirement annuities were purchased from the Aetna Life Insurance Company; and, in addition, it had certain welfare programs for its employees, including a so-called hospitalization program. When said retirement plan was inaugurated, petitioner submitted the same for review by the Pension Trust Division of the Income Tax Unit of the Bureau of Internal Revenue; and it requested and obtained from said Bureau, a ruling to the effect that such plan met the requirements of section 165 of the Internal Revenue Code of 1939, as amended. Thereafter in 1945 it adopted certain modifications to said retirement plan; and it then submitted the changes to said Pension Trust Division and requested and obtained a new ruling to the effect that the plan, as so modified, continued to meet the requirements of section 165 of the Code, as amended.

Petitioner did not, either prior to the inauguration of its 1950 savings plan or during the time that such plan was in effect, submit the plan or the related trust to the Bureau of Internal Revenue for its examination or approval; and, also, it did not request or obtain any ruling from the Bureau as to the qualification of the same under sections 23 (p) and 165 of the 1939 Code. The existence of said 1950 savings plan did not come to the attention of the Bureau of Internal Revenue until the early part of the year 1953, when inquiries were made to it regarding the method of taxation of distributions made thereunder. The Bureau thereupon informed petitioner that it had objections to the plan, and suggested that amendments be made so that it might qualify under the statute and regulations. Petitioner's reply was that it would not amend the plan, and that it was not interested in a ruling.

In petitioner's income tax returns for the years 1950, 1951, and 1952, it claimed deductions for the contributions made under its retirement plan, on that line of the return forms entitled "Amounts contributed under a pension, annuity, stock bonus, or profit-sharing plan, etc." It did not, however, include its contributions to the 1950 savings plan under said classification; but included them with other employees' welfare benefits and various business expenses, and claimed deduction therefor on another line of the return forms entitled "Other deductions authorized by law." No information statement regarding the 1950 savings plan was attached to any of the returns.

Petitioner's 1950 savings plan was not a stock bonus, pension, profit-sharing, or annuity plan, within the meaning of sections 23 (p) and 165 of the 1939 Code; and the contributions of petitioner here involved were not paid under any such plan.

The contributions made by petitioner to the trust under its 1950 savings plan constituted additional compensation paid on account of participating employees under a plan deferring the receipt of such compensation by any employee, within the meaning of section 23 (p)

(1) ; and the employees' rights to or derived from such contributions or such compensation were not nonforfeitable at the time the contributions or compensation was paid, within the meaning of section 23 (p) (1) (D).

OPINION.

The basic issue here presented is whether the contributions which petitioner made in 1950 to the Mississippi River Fuel Corporation Savings Trust, pursuant to its so-called 1950 savings plan, qualify for deduction from its gross income under section 23 (p) of the 1939 Code.

A similar issue, involving the deductibility of contributions made by the same corporation to the same trust and under the same savings plan for the 2 subsequent years, 1951 and 1952, was recently decided adversely to said corporation by the United States District Court for the Eastern District of Missouri, Eastern Division, in *Mississippi River Fuel Corporation* v. *Koehler*, 164 F. Supp. 844. We agree with the decision of the District Court in that case.

The 1939 Code, as amended and in effect during the year here involved, provides in part as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

(p) CONTRIBUTION OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.—

(1) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under subsection (a) but shall be deductible, if deductible under subsection (a) without regard to this subsection, under this subsection but only to the following extent:

There then follow several paragraphs of said section, of which only the first four are here material. These paragraphs may be summarily described, as follows:

Paragraph (A) deals specifically with the deductibility of contributions paid by an employer into a trust under a pension plan. The Treasury regulations for the related section 165 of the Code pertaining to employees' trusts (Regs. 111, sec. 29.165–1, as amended) state that a "pension plan" is a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years, usually for life, after retirement; and that retirement benefits generally are measured by, and based on, such factors as years of service and compensation received by the employees.

Paragraph (B) deals specifically with the deductibility of contributions paid by an employer toward the purchase of retirement

annuities, under a plan which meets the requirements of specified provisions of section 165.

Paragraph (C) deals specifically with the deductibility of contributions paid by an employer into a trust under a stock bonus or profit-sharing plan. The Treasury regulations (Regs. 111, sec. 29.165–1, as amended) state that a "profit-sharing plan" is a plan established and maintained by an employer to provide for the *participation in his profits*, by his employees or their beneficiaries; and that a "stock bonus plan" is a plan similarly established and maintained by an employer to provide benefits similar to that of a profit-sharing plan, except that the contributions by the employer *are not necessarily dependent upon profits* and the benefits are distributable in stock of the employer company.

Paragraph (D) deals specifically with the deductibility of compensation paid or accrued by an employer on account of any employee, under a plan deferring the receipt of such compensation (as mentioned in section 23 (p) (1)), but which is not a plan included in any of the above-mentioned paragraphs (A), (B), or (C). This paragraph reads as follows:

(D) In the taxable year when paid, if the plan is not one included in paragraphs (A), (B), or (C), if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid.

The general application and effect of section 23 (p), as amended, is described in the Treasury regulations relating thereto, as follows:

Section 23 (p) prescribes limitations upon deductions for amounts contributed by an employer under a pension, annuity, stock bonus, or profit-sharing plan, or under any plan of deferred compensation. * * * Section 23 (p) does not apply to a plan which does not defer the receipt of compensation. Neither does section 23 (p) apply to deductions for contributions under a plan which is primarily a dismissal wage, or unemployment benefit plan or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, or a combination thereof. Section 23 (p) is, however, applicable to all contributions (including contributions to provide incidental benefits such as life insurance protection) under a stock bonus, pension, profit-sharing, or annuity plan, whether or not the employees' rights in such contributions are nonforfeitable, but deductions under this section are subject to conditions and limitations under section 23 (a) as well as those particularly provided in section 23 (p). [Regs. 111, sec. 29.23 (p)–1, as amended.]

In the instant case, the parties have stipulated that the contributions of petitioner under its 1950 savings plan "constituted compensation and, with respect to each employee for whom a contribution was made, this additional compensation, plus all other compensation paid or accrued to the employee, constituted reasonable compensation for the services actually rendered by that employee during the period for which the contribution was made." It is apparent,

also, that it was a "plan deferring the receipt of such compensation" (section 23 (p) (1)), because the contributions were paid into a trust, and the receipt of any right therein by any employee was deferred, either (1) until the plan terminated on December 31, 1952, or at such earlier time as petitioner's board of directors might designate, or (2) until, in the case of any particular member-employee, he might be laid off, disabled, or retired prior to termination of the plan. Thus, there can be no question (and indeed there is no dispute) that the deductibility of the contributions made by petitioner under its 1950 savings plan are controlled and limited by the provisions of section 23 (p), as amended. If such contributions are deductible at all, they must qualify for deduction under that section. *Times Publishing Co.*, 13 T. C. 329, affirmed per curiam (C. A. 3) 184 F. 2d 376; *Tavannes Watch Co.* v. *Commissioner*, (C. A. 2) 176 F. 2d 211.

Petitioner makes no claim that its 1950 savings plan was a pension plan, or a plan for the purchase of retirement annuities, so that its contributions here involved would qualify for deduction under either paragraph (A) or paragraph (B) of section 23 (p) (1), as amended; nor does it contend that such savings plan was a stock bonus plan, so that the contributions would qualify for deduction under those provisions of paragraph (C) of said section which pertain to payments into a stock bonus trust. It is obvious to us, and we here hold, that none of these provisions are here applicable, and that the contributions involved do not qualify for deduction thereunder.

Petitioner does contend, however, that its 1950 savings plan was a profit-sharing plan and that the trust created thereunder was a profit-sharing trust, within the meaning of paragraph (C) of section 23 (p) (1), as amended; and, accordingly, that its contributions thereto should be allowed deduction under said paragraph. It argues that at the time said savings plan was inaugurated, it had an earned surplus, and could reasonably anticipate that its business would thereafter produce net profits, as it actually did; that the contributions which it made to the trust under the savings plan served to reduce the amounts of profits which would otherwise have been realized; and, accordingly, that such plan had "the effect of a profit-sharing plan," and that the contributions thereto are deductible under said paragraph (C).

We do not agree. The terms "profit-sharing plan" and "profit-sharing trust" as used in said paragraph (C), refer to a particular type of plan and trust under which employees are given a *share* in the *profits* of their employer, if and when such profits are realized. The applicable Treasury regulations above mentioned (Regs. 111, sec. 165–1, as amended) define a "profit-sharing plan" to be one estab-

lished and maintained by an employer "to provide for the participation in his profits," by his employees or their beneficiaries; and they further indicate, by comparison with a stock bonus plan, that one of the distinguishing characteristics of a profit-sharing plan is that it is "necessarily dependent upon profits." These regulations, in our opinion, provide a reasonable interpretation of the statute, and should be given effect. Thus, in order for a plan to qualify as a profit-sharing plan under paragraph (C), the plan must be geared to *profits;* it must be dependent upon the existence of *profits* as distinguished from operating funds out of which contributions of predetermined amounts are paid even though losses rather than profits are realized; and it must provide for the *sharing* or *participation* by the employees in such *profits* as they actually are realized.

Here, neither the provisions of petitioner's 1950 savings plan, nor the provisions of the related trust, nor the minutes of the meeting of petitioner's board of directors at which the plan was inaugurated, nor the written announcements of the plan to the employees, made any mention whatever of profits. Also, they contained no statement or suggestion whatever that the employees were to *share* or have any *participation in the corporation's profits*, or that the amounts of petitioner's contributions or the amounts of the benefits of the employees were *necessarily dependent on profits*. To the contrary, the plan provided, in substance, that any eligible employee who chose to become a member could authorize petitioner to withhold and pay over to the trustee monthly amounts from his current compensation of $5, $10, $15, $20, or $25, as he might elect; and that petitioner would then pay to the trustee, contributions to the plan which were equal to the total of such monthly payroll withholdings. Thereafter, each member who continued to participate until the plan terminated on December 31, 1952, became entitled to receive the total of the contributions made both by him and by petitioner, plus a pro rata share of any of petitioner's contributions that then remained in the savings plan fund due to withdrawals of other members. Thus, neither the amount of petitioner's contributions nor the amount of the benefits for the employees, was in any way related to or dependent on profits. Instead, the amounts to be contributed by petitioner depended upon the number of eligible employees who chose to become members, and the aggregate of the $5-unit amounts which these employees elected to have withheld from their current compensation; and these amounts were estimated in advance by petitioner's board of directors. Also the employees' benefits were geared, not to profits, but to the amounts which they authorized petitioner to withhold, and to the number of employees who might forfeit their rights to participate, through withdrawal from the plan prior to its termination. The plan was

represented to the employees as a "method of saving." The fact that petitioner may have had earned surplus or may have anticipated that there would be year-end profits against which its contributions could be charged is not material; for these contributions of fixed amount, like all of its operating expenditiures, were made out of operating funds, before the existence of profit or loss was ascertainable. We hold that the savings plan was not a profit-sharing plan and the related trust was not a profit-sharing trust, within the meaning of section 23 (p) (1) (C); and that the contributions here involved do not qualify for deduction under said paragraph (C).

Finally, we further hold that petitioner's contributions, here in question, do not qualify for deduction under paragraph (D) of section 23 (p) (1), as amended—because, as we have already indicated, the 1950 savings plan was a plan providing deferred compensation, which was not a plan included in paragraphs (A), (B), or (C), and which did not provide for the requisite nonforfeitability of the member-employees' rights thereunder, as required by paragraph (D). The fact that such rights were forfeitable is evidenced by the provisions of the plan, to the effect that if any member withdrew, or voluntarily left the employment of petitioner, or was discharged for cause, or if the interest of any member in the savings plan fund was levied upon by any legal writ, the member so involved would receive nothing under the plan except the bare amount of the payroll withholdings theretofore made from his own compensation. It was not until the inauguration of the subsequent 1956 savings plan, 3 years later, that petitioner elected, in such subsequent plan, to make the rights of the members *nonforfeitable* at all times and in any event. Paragraph (D) expressly limits deductions thereunder to situations in which the employees' rights to or derived from the employer's contributions are nonforfeitable at the time the contributions are paid.

In our consideration of this case, we have extensively reviewed the legislative history of the Revenue Act of 1942 in which the provisions of section 23 (p), as amended, were first adopted (see review of portions of such history in *Times Publishing Co., supra*); and we also have examined the cases cited by each of the parties, and any other cases coming to our attention which appeared to have a bearing on the problem before us. We have been impelled to conclude from such examination that the Congress, in its enactment of section 23 (p), as amended, and for reasons satisfactory to it, prescribed specific limitations upon deductions for amounts contributed by an employer under any plan of deferred compensation; and that petitioner's contributions to its 1950 savings plan do not qualify for deduction under such limitations. As was stated in the *Times Publishing Co.* case, *supra*, the allowance of a deduction from gross income being a

matter of legislative grace, a particular deduction will be allowed only if there is a clear provision for it in the law.

Moreover, it is to be observed that the Bureau of Internal Revenue established within its Income Tax Unit a so-called Pension Trust Division to aid taxpayers by providing advance review of proposed plans and amendments thereto and by enabling them to obtain rulings as to the qualification of such plans under sections 23 (p) and 165 of the Code. As we have hereinbefore found, petitioner availed itself of these services of the Bureau in obtaining advance approval of its separate retirement plan; but, in the case of its 1950 savings plan, it neither submitted such plan to the Bureau nor gave any information about it in its returns, as required in Regulations 111, sec. 29.23 (p) (2). Indeed, as we have found, when the Bureau later learned indirectly of the existence of such savings plan, questioned its qualification, and suggested that changes be made, petitioner's reply was that it would not amend the plan, and that it was not interested in a ruling. In such situation, we must consider the plan as we find it.

We hold that the contributions of petitioner under its 1950 savings plan, which are here involved, are not deductible from its gross income for the year 1950.

By reason of this holding, it is unnecessary for us to consider other contentions made by the respondent, to the effect that such contributions are not deductible on the further grounds, (1) that the plan was not a "qualified" plan, under section 165, because its maximum 3-year term was too short to make it a permanent plan; and (2) that it was not a qualified plan, because it did not provide for accumulation of profits over a sufficiently long period of years.

*Decision will be entered under Rule 50.*