**MISSISSIPPI RIVER FUEL CORPORA-TION, Appellant,**

v.

**Gustave F. KOEHLER, Appellee.**

**MISSISSIPPI RIVER FUEL CORPORA-TION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

**Nos. 16083, 16090.**

United States Court of Appeals
Eighth Circuit.

April 23, 1959.

Christian B. Peper, St. Louis, Mo. (William A. Dougherty, Washington, D. C., and Grand, Peper, Martin & Roudebush, St. Louis, Mo., were with him on the brief), for appellant-petitioner.

Harry Marselli, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum and Helen A. Buckley, Attys., Dept. of Justice, Washington, D. C., were on the brief), for appellee-respondent.

Before GARDNER, Chief Judge, and VOGEL and MATTHES, Circuit Judges.

VOGEL, Circuit Judge.

We are concerned herein with two cases—No. 16,083, being an appeal from the United States District Court for the Eastern District of Missouri, and No. 16,090, being a petition to review a decision of the Tax Court of the United States. The taxpayer in each instance is the same. With the exception of the taxable years involved, the issues in the two cases are identical. They were briefed and argued together, and will be considered in this single opinion.

The taxpayer is a Delaware corporation with its principal office in St. Louis, Missouri. It is engaged in the sale of natural gas and it owns and operates a gas pipeline extending from Texas into Missouri and Illinois. Taxpayer's total number of employees during the period 1950 through 1952 varied from approximately 450 to approximately 670. Its taxable income for the years 1949 through 1952 was as follows:

| | |
|---|---|
| 1949 | $4,030,996.98 |
| 1950 | 8,326,576.33 |
| 1951 | 8,937,856.91 |
| 1952 | 7,100,084.07 |

In November, 1949, the taxpayer's board of directors created an "employees savings plan" which was to go into effect January 1, 1950. The plan adopted was a simple, effective method to encourage the taxpayer's employees to accumulate systematic savings to which the taxpayer made contributions equal to the savings of the employees. It was available equally to all employees who had completed one year of service. Each employee joining the plan could contribute not less than $5.00 nor more than $25.00 per month in multiples of $5.00. The taxpayer would contribute an equal

amount and deposit the total with a bank as trustee. At the termination of the plan the trustee was to send each employee or member the amount due him less federal withholding tax on the company's or taxpayer's contributions. The savings plan commenced on January 1, 1950, and was to terminate on December 31, 1952, or at such earlier time as the taxpayer should designate. Each employee who participated in the plan until its termination was to receive the total amount of that member's contributions plus an equal amount contributed by the company. Members who should be permanently laid off through no fault of their own or leave the service of the company on account of disability or for other sufficient cause received the total amount of their own contributions plus an equal amount contributed by the company, but members withdrawing of their own volition or who were discharged for good cause would receive only the amount of their contributions to the plan. In other words, the plan was not non-forfeitable insofar as the employees were concerned.

All amounts remaining in the fund at the termination of the plan which represented company contributions made for the account of former participants who had ceased to be members and to whom such amounts had not been paid were to be prorated among the remaining members at the termination of the plan. In that sense, the plan was for the benefit of employees only—the company itself could never receive back any part of what it had already contributed.

The company had the right to modify, suspend or discontinue the plan at any time, but such action could not be retroactive nor affect the rights of the members which had accrued up to the time the company took such action.

The taxpayer accrued on its books and paid into the trust fund the following amounts:

| Year | Amount |
|------|--------|
| 1950 | $ 89,190.00 |
| 1951 | 104,625.00 |
| 1952 | 123,855.00 |

The plan contained no provision which would require that the company's contributions be paid out of profits or were in any way dependent thereon. The plan did not employ the term "profit-sharing" nor did it make any reference to "profits" of the taxpayer.

On November 24, 1952, while the first savings plan was in the third year of its operation, the taxpayer's officers authorized the creation of a second savings plan to begin January 1, 1953, and to end December 31, 1955, in substantially the same form as the savings plan of 1950. On November 1, 1955, a third savings plan was authorized for the years 1956 through 1958. The provisions thereof were substantially the same as the savings plans for the preceding two three-year periods, except that the rights of the participants were changed to make their individual interests in the contributions of the taxpayer *vested and non-forfeitable* in all events. On December 31, 1952, the first three-year savings plan terminated and the trustee thereof distributed in accordance with its provisions a total of $616,963.00 to the participants.

Certain undisputed facts found by the Tax Court and equally applicable to both cases, are of significance, 29 T.C. at pages 1256–1257:

"Prior to petitioner's inauguration of its 1950 savings plan which is here involved, and also at all other times here material, petitioner had in operation a separate retirement plan for its employees, under which retirement annuities were purchased from the Aetna Life Insurance Company; and, in addition, it had certain welfare programs for its employees, including a so-called hospitalization program. When said retirement plan was inaugurated, petitioner submitted the same for review by the Pension Trust Division of the Income Tax Unit of the Bureau of Internal Revenue; and it requested and obtained from said Bureau, a ruling to the effect that such plan met the requirements of section 165 of the Internal Revenue Code of

1939, as amended. Thereafter in 1945 it adopted certain modifications to said retirement plan; and it then submitted the changes to said Pension Trust Division and requested and obtained a new ruling to the effect that the plan, as so modified, continued to meet the requirements of section 165 of the Code, as amended.

"Petitioner did not, either prior to the inauguration of its 1950 savings plan or during the time that such plan was in effect, submit the plan or the related trust to the Bureau of Internal Revenue for its examination or approval; and, also, it did not request or obtain any ruling from the Bureau as to the qualification of the same under section 23(p) and 165 of the 1939 Code. The existence of said 1950 savings plan did not come to the attention of the Bureau of Internal Revenue until the early part of the year 1953, when inquiries were made to it regarding the method of taxation of distributions made thereunder. The Bureau thereupon informed petitioner that it had objections to the plan, and suggested that amendments be made so that it might qualify under the statute and regulations. Petitioner's reply was that it would not amend the plan, and that it was not interested in a ruling.

"In petitioner's income tax returns for the years 1950, 1951, and 1952, it claimed deductions for the contributions made under its retirement plan, on that line of the return forms entitled 'Amounts contributed under a pension, annuity, stock bonus, or profit-sharing plan, etc.' It did not, however, include its contributions to the 1950 savings plan under said classification; but included them with other employees' welfare benefits and various business expenses, and claimed deduction therefor on another line of the return forms entitled 'Other deductions authorized by law.' No infor-

mation statement regarding the 1950 savings plan was attached to any of the returns."

In 1953, certain issues pertaining to the taxpayer's taxes for the years 1949 and 1950 were before the Tax Court. At that time the Commissioner of Internal Revenue, by amended answer, challenged the deductibility of taxpayer's contributions to the savings plan for the year 1950. The original issues between the taxpayer and the Commissioner were disposed of by stipulation, leaving only the question of the deductibility of the 1950 contributions to the savings plan. The Tax Court determined that issue adversely to the taxpayer. An audit of the taxpayer's returns for the years 1951 and 1952 caused the Commissioner to disallow the taxpayer's contributions to the savings plan for those years also and to make deficiency assessments. The taxpayer paid such deficiencies, filed timely claims for refund and upon disallowance, instituted action in the United States District Court for the Eastern District of Missouri. That court likewise held adversely to the taxpayer's contentions. Each of the courts below, that is, the Tax Court of the United States and the United States District Court, found that the taxpayer's savings plan as inaugurated in the first instance in 1950 was not a "stock bonus, pension, profit-sharing, or annuity plan", within the meaning of 26 U.S.C.A. § 23(p) (1) (C) and § 165 of the 1939 Code; that it was a plan providing for the payment of deferred compensation under which the employees' rights to such payments were forfeitable and that accordingly the taxpayer's contributions were not deductible under 26 U.S.C.A. § 23(p) (1) (D). The District Court's opinion is reported at page 844 of 164 F.Supp. and the Tax Court's opinion at page 1248 of 29 T.C.

It is not contended here by the taxpayer that its plan was a stock bonus, annuity or pension plan. For the contributions to the 1950 savings plan on the part of the taxpayer to be deductible at all, it is conceded they must fall either within the provisions of 26 U.S.C.A. § 23

(p) (1) (C), dealing with profit-sharing, or under 26 U.S.C.A. § 23(p) (1) (D), dealing with deferred compensation. Insofar as the latter classification is concerned, the company's payments of deferred compensation in order to be deductible had to be non-forfeitable at the time of payment. Obviously, the taxpayer's plan as originated in 1950 did not meet that qualification. The taxpayer must have decided for reasons of its own that the contributions it made to the fund should be forfeited by those employees who left the taxpayer's employ without just cause, of which the company would be the judge, or were discharged for cause. The fact that the forfeiture was to the remaining employees and not back to the employer still does not make for qualification. See Lichter v. Commissioner, 17 T.C. 1111, affirmed 6 Cir., 1952, 201 F.2d 49, certiorari denied 345 U.S. 942, 73 S.Ct. 833, 97 L.Ed. 1368; Wm. M. Bailey Co. v. Commissioner, 15 T.C. 468, affirmed 3 Cir., 1951, 192 F.2d 574; Times Publishing Co. v. Commissioner, 13 T.C. 329, affirmed 3 Cir., 1950, 184 F.2d 376. Clearly, the contributions were not deductible under § 23(p) (1) (D).

The remaining and most troublesome question is whether or not the taxpayer's contributions could be considered as having been made to a profit-sharing plan. Other than the two decisions reviewed here, no court has considered the problem of what constitutes a "profit-sharing" plan within the meaning of the statute. Taxpayer cites cases which it contends are suggestive of a holding contrary to that of the courts below. These cases we have considered and find none of them directly in point nor as persuasive as the two opinions challenged herein.

Taxpayer contends that in reality its plan was geared to and was dependent upon the existence of profits since the payments were made out of profits and the taxpayer had reserved the right to amend, suspend, or terminate the trust at any time, and it therefore could have terminated the plan any time profits were not being realized. The taxpayer had substantial profits during the years in question so it must be conceded that taxpayer's contributions did actually come from and reduce the amount of its profits. We do not think, however, that is the criterion or the guide. Taxpayer's contention in that regard would automatically make a profit-sharing plan out of any plan adopted by any company which ended the year with profits and otherwise complied with § 165. The other side of that coin would be that if the employer ended a year without profits the same identical plan would not be a profit-sharing one, and contributions thereto accordingly would not be deductible. No such illogical result can be spelled out of the wording of the statute nor is any such Congressional intent manifested. In this regard, the District Court stated, 164 F.Supp. 844, 845:

> "The plan in question does not mention profits, and the proof leads one to the conclusion that it had nothing whatever to do with profits. While it is true that in each of the years in question the taxpayer had a profit many times more than the contribution made to the trust fund, yet had it operated at a loss it would have been obligated under the plan to make the contributions. The testimony discloses that the plan was set up primarily for the purpose of employer-employee relationships, that the taxpayer's business was such that it had over $100,000 invested with repect to each employee, that in an effort to aid in employer-employee relations and to minimize the turnover of employees the plan was conceived, drafted and put into effect, that when the plan was published it was called a savings plan, and that one of its purposes was to encourage thrift among the employees."

It is also significant that the taxpayer was familiar with the submission of plans to the Internal Revenue Department for assistance and approval; that it had done so with reference to its other

plans and amendments thereto; that it did not do so as to this plan and that when the Internal Revenue Department became aware of its existence through employee inquiries regarding tax treatment of their benefits and questioned the deductibility of contributions hereunder, the taxpayer refused to make any change to comply with the provisions of the statutes and regulations " * * * and stated in effect that it was a plan that had been devised for the employees and they intended to follow through with it since it had met with the general approval of the employees, regardless of whether or not it was a deductible item." Additionally, the taxpayer's failure to give an informative statement regarding the 1950 savings plan on its returns and its failure to claim deductions for the plan on that line of the tax returns entitled "Amounts contributed under a pension, annuity, stock bonus, or *profit-sharing plan*, etc." gathers further significance and detracts from the taxpayer's present assertion that all along this was a profit-sharing plan.

■■■ We agree with the Tax Court where it said, 29 T.C. at pages 1260–1261:

" * * * The terms 'profit-sharing plan' and 'profit-sharing trust' as used in said paragraph (C), refer to a particular type of plan and trust under which employees are given a *share* in the *profits* of their employer, if and when such profits are realized. The applicable Treasury regulations above mentioned (Regs. 111, sec. 165–1, as amended) define a 'profit-sharing plan' to be one established and maintained by an employer 'to provide for the participation in his profits,' by his employees or their beneficiaries; and they further indicate, by comparison with a stock bonus plan, that one of the distinguishing characteristics of a profit-sharing plan is that it is 'necessarily dependent upon profits.' These regulations, in our opinion, provide a reasonable interpretation of the statute, and should be given

effect. Thus, in order for a plan to qualify as a profit-sharing plan under paragraph (C), the plan must be geared to *profits*; it must be dependent upon the existence of *profits* as distinguished from operating funds out of which contributions of predetermined amounts are paid even though losses rather than profits are realized; and it must provide for the *sharing* or *participation* by the employees in such *profits* as they actually are realized.

"Here, neither the provisions of petitioner's 1950 savings plan, nor the provisions of the related trust, nor the minutes of the meeting of petitioner's board of directors at which the plan was inaugurated, nor the written announcements of the plan to the employees, made any mention whatever of profits. Also, they contained no statement or suggestion whatever that the employees were to *share* or have any *participation in the corporation's profits*, or that the amounts of petitioner's contributions or the amounts of the benefits of the employees were *necessarily dependent on profits*."

The taxpayer here claims to come within the "profit-sharing plan" without in any way hooking up or gearing its contributions to profits or providing that the contributions should be paid out of profits. Its contributions were solely controlled by the amount of the contributions of its employees; they were to be made whether the company realized a profit or not. The taxpayer refused to change its plan even when the non-deductibility of its contributions thereto was called to its attention by the Bureau of Internal Revenue. The slight change of making its contributions non-forfeitable insofar as its employees were concerned and thereby qualifying for deductibility under § 23(p) (1) (D) dealing with deferred compensation was not accepted until the promulgation of the third three-year plan. We can only assume that the taxpayer at first concluded that an em·

ployee who would have to forfeit his right to the company's contributions to the fund if he severed his employment or acted in such fashion as to justify his discharge would be a more stable and, therefore, a more desirable employee than one who could leave his employment at any time without sacrificing his interest in the employer's contributions, and that the penalty of non-deductibility of its contributions was justified by the thereby increased stability of its employees. What may have been the taxpayer's reasons for refusing to gear the plan to profit-sharing is certainly non-apparent, but in any event immaterial.

Applying what the Supreme Court, in Interstate Transit Lines v. Commissioner of Internal Revenue, 1943, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607, rehearing denied 320 U.S. 809, 64 S.Ct. 26, 88 L.Ed. 489, referred to as " * * * the now familiar rule that an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer", and that " * * * allowance of deductions from gross income does not turn on general equitable considerations," Deputy v. du Pont, 1940, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416, we hold that the Tax Court and the District Court herein were clearly within their right in concluding that the taxpayer had failed to carry the burden of showing that this plan came within the statutory meaning of a "profit-sharing plan". The fact of the matter is that this was not a profit-sharing plan and contributions thereto were accordingly not deductible as such.

Congress specifically limited the deductibility of contributions by an employer to the specific types of plans set forth in the statute. It is for Congress to enlarge upon the statute if such be desirable; it is not the prerogative of the courts to expand by strained construction.

The government puts forward additional objections to the taxpayer's 1950 savings plan in that it is claimed it does not comply with reasonable regulations promulgated by the Commissioner with reference to permanency of the plan and length of time for contributions accumulations. See Rev.Rul. 54–231, 1951–1 Cum.Bull. 150; Treasury Regulations 111, Sec. 29.165–1(a) (3); Treasury Regulations 118, Sec. 39.165–1(a) (3). Neither the Tax Court nor the District Court reached these questions and in view of our disposition of the cases we, too, feel discussion thereof unnecessary.

Affirmed.