THOMAS TREBOTICH AND JEANNE TREBOTICH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3705-69. Filed December 9, 1971.

*Benjamin O. Anderson* and *Norman Leonard*, for the petitioners.
*Lawrence G. Becker*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $1,693.41 in the petitioners' Federal income tax for 1967. The issue

---

for decision is whether a lump-sum payment received by one of the petitioners under an early retirement plan should be taxed as a long-term capital gain. The answer depends upon whether, to qualify under section 401(a) of the Internal Revenue Code of 1954,[1] a pension plan must be "funded" and whether the plan under which the petitioner received the lump-sum payment was funded.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Thomas and Jeanne Trebotich, are husband and wife and maintained their residence in Oakland, Calif., at the time the petition was filed in this case. They filed their 1967 joint Federal income tax return with the district director of internal revenue, San Francisco, Calif. Mr. Trebotich will sometimes be referred to as the petitioner.

On or about June 30, 1967, the petitioner retired from his job as a longshoreman on the San Francisco docks. On that date, he was qualified to receive, and applied in writing for, a "vesting benefit" under a 1966 agreement negotiated by the International Longshoremen's and Warehousemen's Union (ILWU) and the Pacific Maritime Association (PMA). The PMA was an employers' association with the primary function of negotiating and administering labor contracts with the Pacific coast maritime unions. Pursuant to this agreement, the petitioner received two monthly payments of $270.84 less applicable payroll and withholding taxes. He then properly applied to have the remaining monthly payments to which he was entitled paid to him in one lump sum; and on or about August 25, 1967, he received a lump-sum payment of $12,291.66 less applicable payroll and withholding taxes.

In an effort to mechanize the operations and bring about greater efficiency in the west coast shipping industry, an agreement was entered into between the ILWU and the PMA on November 15, 1961. As a part of the agreement, it was provided that the employers would contribute to a mechanization fund. The agreement also provided for the establishment of three trusts—a vesting benefit trust, a welfare trust (which was to handle the payment of certain death and disability benefits), and a trust to distribute certain supplemental unemployment benefits. Funds were to be transferred from the mechanization fund to such trust as they were needed. The 1961 agreement expired on June 30, 1966, but in a 1966 agreement, the mechanization fund, the vesting benefit trust, and the welfare trust were all continued.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

Under the 1966 agreement, the employers were to contribute approximately $38 million to the mechanization fund, at the rate of $7.4 million per year.[2] The PMA was to collect such funds from the employers and had the power to compel defaulting employers to meet their obligations to the fund. While the PMA did not have the power to increase the rate of yearly contributions above $7.4 million per year, it was permitted to decrease the rate of contributions, if there were no immediate or projected needs for the funds. However, the total amount of contributions could be reduced if and only if the union engaged in unauthorized work stoppages or other actions inconsistent with the agreement.

The PMA was to administer the mechanization fund. As such, the PMA was to act as the agent of the employers and as a "conduit for transferring the whole, or portions, of the Mechanization Fund" to the vesting benefit trust. It was not to "act as a repository of Contributions by Employers to the Mechanization Fund beyond such time as may be reasonably necessary to perform accounting and banking transactions required for effectuation of the Plan * * *." During the time that the PMA was to hold the contributions, it was to act only as a collecting agent, and neither the trustees of the vesting trust, those of the welfare trust, the employees, nor the ILWU were to "have any right, title or interest, or any claim whatsoever, legal or equitable, in or to any portion of the Mechanization Fund," except as provided in the agreement. Each employer's interest in the fund was based upon the proportion of his contributions thereto, and the PMA was not to commingle the contributions with any other funds it held.

The PMA was to transfer funds from the mechanization fund to the vesting benefit trust as they were required for the immediate payment of the trust's obligations or expenses. The trustees were required to submit to the PMA periodic reports concerning the monthly obligations of the trust, and the amount of funds to be transferred was based on these reports. Neither the PMA, the ILWU, nor any employer had any interest in the funds after they were transferred to the trust, and once funds were transferred to the trust, they were to be used immediately.

To become a beneficiary of the vesting benefit trust, an employee had either to remove himself voluntarily or to be removed mandatorily from the longshoremen labor force. To be eligible for voluntary re-

---

[2] In addition to the $7.4 million per year, $1.2 million was to be contributed by the employers over a 3-year period to pay benefits which had vested under the 1961 agreement. The existence of this $1.2 million is not of importance in this case and mention is made of it only to explain how the $38 million figure was determined.

moval, a longshoreman must have had at least 25 years of service, be at least 62 years of age, and make a written application for benefits. If an employee retired and made a written application when he first became eligible for benefits, he received a total of $13,000 of benefits, but if he delayed retiring or filing his application, the total benefits that he would receive were reduced. The $13,000 in benefits could also be reduced if the amount of employers' contributions was insufficient to pay all the benefits which had accrued. Benefits were to be payable monthly, but upon request by the employee, the trustees could, at any time, distribute an employee's remaining benefits to him in a lump sum.

The 1966 agreement was amendable, except as to the provisions regarding the interests which the employers, the ILWU, the PMA, and the employees had in the funds once they were transferred to a trust. Except for the paying of benefits to persons who had qualified before July 1, 1971, and the distribution of any other moneys which had not been distributed by that time, the agreement was to run concurrently with the basic union contract and terminate July 1, 1971. Finally, the agreement was conditioned on the continued validity of a letter ruling under the 1961 agreement, which permitted the employers to take an income tax deduction for contributions when the PMA transferred the contributions to the trusts.

The petitioner reported the $12,833.34 received from the vesting benefit trust as a long-term capital gain. The respondent, in his notice of deficiency, treated the $12,833.34 as ordinary income on the basis that the vesting benefit trust did not meet the requirements of section 401.

OPINION

Section 402(a)(2), as in effect for 1967, provided that if the total distributions payable to an employee from a trust meeting the requirements of section 401(a) were paid within 1 year by reason of the employee's separation from service, such distributions were taxable as a long-term capital gain.[3] Whether the petitioner is entitled to treat the payments which he received from the vesting benefit trust as a long-term capital gain depends upon whether that trust was a part of a plan which meets the requirements of section 401. The resolution of this issue necessitates the consideration of two basic questions: (1) Must a plan qualifying under section 401 be funded; and (2) do the provisions of the 1966 agreement providing for vesting benefits establish a funded plan? Before discussing these questions, the possibility that the 1966 agreement established a qualified profit-sharing plan will be examined.

---

[3] Sec. 402(a) was amended by sec. 515(a)(1) of the Tax Reform Act of 1969 (83 Stat. 643–644) to limit the long-term capital gain treatment of qualified trust distributions.

At the trial, the petitioner took the position that the vesting benefit trust was part of either a pension plan or a profit-sharing plan. On brief, the petitioner made no reference to his position that the vesting benefit trust could qualify as a part of a profit-sharing plan; and in any event, it is clear that such position has no merit.

Section 1.401–1(b)(1)(ii), Income Tax Regs., states that, for purposes of section 401, "A profit-sharing plan is a plan established and maintained by an employer to provide for the participation in his profits by his employees or their beneficiaries." Although the 1966 agreement stated that the mechanization fund was established to enable employees to share in the savings that would result to employers from mechanization and modernization of longshore operations, the payments made by the employers into the fund were in no way geared to or dependent upon the existence of profits, but were in predetermined amounts. Such a plan is not a profit-sharing plan under the statute and Income Tax Regulations. *Mississippi River Fuel Corporation* v. *Koehler*, 266 F. 2d 190 (C.A. 8, 1959), affirming 29 T.C. 1248 (1958) and 164 F. Supp. 844 (D. Mo. 1958), certiorari denied 361 U.S. 827 (1959).

Having decided that the vesting benefit plan is not a profit-sharing plan, we now reach the more serious question of whether the plan is a pension plan which meets the requirements of section 401. A pension plan which does meet such requirements is referred to as a qualified plan.

In general, section 401 sets forth the requirements for the qualification of a trusteed pension, profit-sharing, or stock bonus plan. Such a plan must provide for the accumulation of employer or employee contributions for the purpose of distributing them to employees, must prohibit the diversion of any such contributions prior to the satisfaction of all obligations under the plan, and must not discriminate in favor of officers, shareholders, supervisors, or highly compensated employees. Employer contributions to a qualified plan are deductible, subject to certain limitations, irrespective of whether the employees' rights to them are forfeitable, and the earnings of such a trust are not taxable to the trust. An employee covered by such a plan is not taxable on the contributions made on his behalf until the benefits are distributed to him; and under some circumstances, a lump-sum distribution is taxable to him as a long-term capital gain. Section 403 provides similar tax treatment for annuity plans in which there is no trust, and section 401(f) extends similar tax treatment to certain plans in which the funds are held by a custodian, instead of a trust.

Although section 401 refers to the accumulation of funds in a trust, neither that section nor the regulations thereunder explicitly require

that a qualified pension plan be funded. However, the Commissioner has issued revenue rulings requiring funding of a qualified plan. See, e.g., Rev. Rul. 71–91, 1971–1 C.B. 116; Rev. Rul. 69–421, 1969–2 C.B. 59, 62. The respondent seems to use the term "funded" to describe the accumulation of contributions in an entity beyond the employer's control and prior to the payment of benefits. Such a definition is narrower than that used by some commentators who consider any plan which entails accumulation prior to the payment of benefits as funded, and who designate the funding to which the respondent refers as "advance funding." See Rothman, Establishing & Administering Pension & Profit Sharing Plans & Trust Funds 105 (1967). But see Duncan & Chaice, "Relative Merits of Funded & Unfunded Plans" in Sellin, Taxation of Deferred Employee and Executive Compensation 258, 262 (1960). Regardless of whether they call it funding or advance funding, commentators seem uniformly to agree that it is required to have a qualified pension plan. See, e.g., Holzman, Guide to Pension and Profit Sharing Plans 6 (1969); Montgomery's Federal Taxes 3–23 (39th ed. 1964); 2 Rabkin & Johnson, Federal Income, Gift and Estate Taxation, ch. 15.01, p. 1504; Rothman, *supra* at 107; Wood & Cerney, Tax Aspects of Deferred Compensation 234 (2d ed.); Duncan & Chaice, *supra* at 258, 262. In this opinion, the term funding will be used to mean the accumulation of funds in a person independent of the employer.

To be funded, a trust must have more than a res. A trust res is the trust property and nearly any property interest which is capable of being beneficially owned (Bogert, Law of Trusts and Trustees, sec. 111 (1965)), including a promise made under seal to contribute to a pension plan, can constitute a trust res. Rev. Rul. 55–640, 1955–2 C.B. 231. Cf. *Tallman Tool & Machine Corporation*, 27 T.C. 372 (1956); *555, Inc.*, 15 T.C. 671 (1950), affirmed per curiam 192 F. 2d 575 (C.A. 8, 1951). For purposes of determining whether contributions are deductible, it has been held that a trust exists when, and only when, the trust has a res. *West Virginia Steel Corporation*, 34 T.C. 851 (1960); *Tallman Tool & Machine Corporation, supra; Abingdon Potteries, Inc.*, 19 T.C. 23 (1952); *Crow-Burlingame Co.*, 15 T.C. 738 (1950), affirmed per curiam 192 F. 2d 574 (C.A. 8, 1951); *555, Inc., supra.* In those cases, the only issue was when was the trust established; no issue was raised as to whether the trust qualified under section 401. In the present case, there is little doubt that the rights of the trust under the 1966 agreement constituted a trust res and that a trust existed; the question is whether the trust is funded so that the plan qualified under section 401.

In the early 1900's, there were three basic forms of pension plans. One involved the payment of benefits by the employer as they became

due; the second, the establishment by the employer of a reserve account to accumulate funds for pensions; and the third, the accumulation of funds in a trust. Harbrecht, Pension Funds and Economic Power 7 (1959). Only the third type could be said to be funded, as the first involved no accumulations and the second, accumulations within the employer's absolute control.

Prior to 1921, there were no specific provisions in the revenue laws dealing with employee trusts. Generally, if an employer made contributions to a pension fund which he held, the contributions were not deductible; but if he made them to a fund which he did not hold, they were deductible. See O.D. 110, 1 C.B. 224 (1919); art. 136, Regs. 33. The tax consequences to the employee were determined under the constructive-receipt doctrine (4A Mertens, Law of Federal Income Taxation, sec. 25B.02, p. 3 (1966)), and income earned by the trust was taxable under the rules applicable to trusts in general. Revenue Act of 1918, sec. 219, 40 Stat. 1071–1972.

The Revenue Act of 1921 provided that the income of "A trust created by an employer as a part of a stock bonus or profit-sharing plan * * * to which contributions are made by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated" was not taxable until distributed to the employee. Revenue Act of 1921, sec. 219 (f), 42 Stat. 247. In 1926, such provision was expanded specifically to include pension trusts, and the basic language of the present section 401 (a) (1) came into being. Revenue Act of 1926, sec. 219 (f), 44 Stat. 33.

The 1921 and 1926 Acts contain no provision dealing explicitly with the deductibility of contributions to a pension trust, but under the general provision dealing with the deductibility of business expenses, the regulations limited employer deductions to the amount of contributions made to plans under which the employer himself did not hold the funds. Sec. 214 (a), art. 109, Regs. 65, 69. The Board of Tax Appeals, in applying a standard like that of the regulations, denied an employer a deduction where the employer simply set aside funds in a reserve account, but allowed a deduction where the employer made contributions to a trust. *Merrill Trust Co.*, 21 B.T.A. 1409 (1931); *Lemuel Scarbrough*, 17 B.T.A. 317 (1929).

In 1928, employer contributions to a qualified pension trust were, by statute, made presently deductible, if for present services, and deductible over a 10-year period if for past services. Revenue Act of 1928, sec. 23 (q), 45 Stat. 802. The deduction for past services was added by the Senate Finance Committee. The committee noted that employer contributions to funds held by the employer were not deductible (see *Merrill Trust Co.*, *supra* at 1410) and desired to allow a

deduction, to be spread over a 10-year period, for such funds if they were transferred to a qualified pension trust. S. Rept. No. 960, to accompany H.R. 1 (Pub L. No. 562), 70th Cong., 1st Sess., p. 21–22 (1928). The importance of the Senate report is that it explicitly recognized that there were various forms of pension plans, did not suggest any change in the treatment in pension funds held by the employers, but did indicate that the favorable tax treatment was intended to apply only when the pension funds were not held by the employer. See *Caxton Printers, Ltd.*, 27 B.T.A. 1110 (1933).

The subsequent legislative history of the tax treatment of pension trusts involved provisions designed to assure that the funds set aside for such purposes would actually benefit employees generally. In 1938, the favorable tax treatment was limited to trusts under which it was impossible for the corpus or income of the trust to be used by the employer before all liabilities to the employees under the trust were met. Revenue Act of 1938, sec. 165 (a), 52 Stat. 518. This provision had the purpose of assuring the employee that he would not be deprived of expected benefits by the diversion of the accumulated funds from the trust. H. Rept. No. 1860, to accompany H.R. 9682 (Pub· L. No. 554), 75th Cong., 3d Sess., p. 46 (1938). In 1942, the pension trust provisions were revised extensively. The nondiscrimination requirements were established to deny qualification to a plan which "either cover[ed] only a small percentage of the employees or else favor[ed] the higher paid or stock-holding employees * * *." H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 413. The earlier provisions referred to a trust which accumulates principal and income, but in 1942, the language was changed so as to refer to a trust which accumulates corpus and income. There was no discussion of this change in the legislative history, thus suggesting that the draftsmen considered that the substitution of corpus for principal had no significance and that for this purpose the two words had similar meanings. In addition, most of the tax advantages of a qualified pension trust were made available to a nontrusteed plan under which annuity contracts were purchased for employees, if the plan met the requirements of section 401. Finally, the provision for long-term capital gains treatment of a lump-sum distribution from a qualified pension trust was enacted. The reason given for such provision was to relieve taxpayers who received such a lump-sum distribution from the added tax burden resulting from the taxation in a single year of income accumulated over a number of years.

Even though Congress has never said explicitly that a qualified plan must be funded, it has referred to the accumulation of principal, or corpus, in a trust, and it is clear that all of the provisions relating to qualified plans were enacted on the assumption that funds would be

accumulated in a trust or by some person other than the employer for the subsequent payment of the benefits to the employees. The statutory provisions relating to qualified plans establish special and favorable tax treatment for the participants in such plans. As stated by a Presidential committee, "The purpose of tax concessions granted by the Federal Government to qualified pension plans is to encourage the growth of sound plans which supplement the public retirement security system." The President's Committee on Corporate Pension Funds and Other Private Retirement and Welfare Programs, Public Policy and Private Employee Retirement Plans 50–51 (1965). The interests of the employees are furthered by having an employer set aside, while the employees are working, the funds to be distributed to them when they retire. In that manner, the employees' retirement funds are protected from the misfortunes that may occur to the employer. The diversion of funds accumulated for the retirement of employees is specifically prohibited. We cannot assume that Congress would have extended the favorable tax treatment to plans in which funds were not accumulated in an independent trust or similar manner for the benefit of employees. Thus, we think that it is fair to conclude from the legislative history that Congress expected qualified plans to be funded.

At least two courts have approved of qualified plans in which the funds were accumulated by an independent person, even though a formal trust was not created. In *Tavannes Watch Co.* v. *Commissioner*, 176 F. 2d 211, 215 (C.A. 2, 1949), a separate corporation was formed to hold the funds accumulated under the plan, and the court held that such a corporation should be considered a trust for purposes of section 401. In *South Penn Oil Co.*, 17 T.C. 27 (1951), the employer made contributions to a life insurance company which did not segregate such contributions, but which agreed to purchase annuities for the employees as they retired. This arrangement was held to be a trust for purposes of section 401. These cases demonstrate that, although a formal trust may not be required, a plan will be qualified when funds are accumulated in the hands of a person independent of the employer.

In the light of the legislative history and the court decisions, we conclude that a qualified plan must be funded. Having reached such conclusion, we now come to the question of whether the vesting benefit plan was so funded.

Under the 1966 agreement, the vesting benefit trust acquired only such funds as were immediately necessary to meet its obligations, including the payment of benefits to employees and the payment of its administrative expenses. Under the agreement, it is not altogether clear as to the precise period that the trust would hold funds, but it is clear that it would not hold any substantial funds for any significant

period of time. For all practical purposes, the vesting benefit trust was merely a conduit, receiving the funds from the PMA and paying them over to the employees. It did not have the typical duties of a fiduciary of receiving the employer contributions when made and of holding and investing such funds until distributed to employees; rather, it was more like an agent, acting merely as a conduit, that received money with one hand from the PMA and distributed it to the employees with its other hand. Such an arrangement does not constitute funding of a trust as contemplated under section 401.

Nor is it clear that the PMA was to accumulate funds under the plan. At one place, the 1966 agreement provided for the PMA to collect funds from the employers at predetermined annual rates. However, the agreement elsewhere provided that the PMA was not to act as a repository but was merely to collect the necessary funds from the employers. The PMA was given the power to reduce the scheduled contributions when it found that they were unnecessary to meet the obligations of the trust under the agreement. Thus, it appears that although the contributions were to be made at scheduled annual rates, the PMA could, and should, reduce them to a rate sufficient to pay the benefits as they became due to employees. If in fact the agreement operated in that manner, then funds were not accumulated by the PMA in a substantial amount for any significant period of time.

Even if substantial funds were accumulated by the PMA, such fact does not constitute the fundings contemplated by section 401. Clearly, if the employers merely accumulated the funds in reserve accounts established and controlled by them, the arrangement would not constitute the funding of a qualified plan. *Reginald H. Parsons*, 15 T.C. 93 (1950) ; *Caxton Printers, Ltd., supra; Merrill Trust Co., supra; Spring Canyon Coal Co.*, 13 B.T.A. 189 (1928), affd. 43 F. 2d 78 (C.A. 10, 1930), certiorari denied 284 U.S. 654 (1931). The 1966 agreement provided expressly that the PMA was to act as the agent of the employers and that the vesting benefit trust was to have no legal or equitable rights to the funds held by the PMA, except as provided in the agreement. The agreement did confer certain contract rights upon the trust, and it may be that under California law certain duties were imposed upon the PMA with respect to the handling of the funds; nevertheless, the contract rights of the trust and the duties thus imposed upon the PMA did not impress a trust upon the funds. Despite those rights and duties, the PMA held the funds as the agent of the employers, not as a fiduciary. The agreement did not give the PMA the power to invest the funds it collected, nor was there any provision for it to pay interest on any funds which it . might hold. For their own reasons, the employers arranged to have

their agent, the PMA, hold the funds until they were needed by the vesting benefit trust. The effect of the arrangement was as if the employers merely set aside the funds in a reserve account which they maintained. We cannot ignore the explicit provisions of the agreement; we must conclude that in effect the funds were still held by the employers, that the funds were not transferred to the vesting benefit trust to be held by it for any substantial period of time, and that the plan was not funded as contemplated by section 401.

It has been argued that the agreement imposed upon the employers the obligation to pay $38 million to the mechanization fund and that such obligation constituted the funding of the plan. However, there are several difficulties with that argument. First, it should be remembered that the amount to be contributed by the employers was subject to reduction in the event of unauthorized work stoppages or certain other actions. Secondly, and most significantly, no substantial funds were apparently to be accumulated by the PMA or by the vesting benefit trust. In effect, the employers were merely obligated to contribute to the trusts such amounts as they needed, up to $38 million; if the benefits distributed by the two trusts did not use up the entire $38 million, the excess was to be distributed as agreed upon by the PMA and the ILWU. The only difference between such an arrangement and a pay-as-you-go retirement plan was that the money passed through the hands of two intervening parties, the PMA and the trust. Thus, the agreement did not provide for any funds to be accumulated, in any substantial amount or for any significant period of time in the hands of a trust or similar person.

The petitioner argues that since the employers are allowed to deduct their contributions to the vesting benefit trust, the employees should be allowed capital gain treatment when they receive a lump-sum distribution from that trust. However, there are situations in which an employer may deduct his contributions to a pension plan even though it does not qualify under section 401. See sec. 404(a) (5). Yet, distributions from a nonqualified trust are never entitled to long-term capital gain treatment. See sec. 402(b). Thus, there is no necessary correlation between the deductibility of the employer contributions and the availability of long-term capital gain treatment for the employee.

Also unconvincing is the petitioner's argument that we will invalidate or undermine the 1966 agreement if we do not hold that he is entitled to long-term capital gain treatment. Congress has seen fit to relieve employees who receive a lump-sum distribution from a qualified trust in a single year from the tax burden that would otherwise be imposed upon such distribution; our responsibility is to determine whether this petitioner qualifies for that tax relief, and based upon an interpretation of the statute and the legislative history, we have con-

cluded that he does not come within the class of taxpayers for whom such relief was designed. Moreover, we doubt that our holding in this case will significantly undermine the agreement between the ILWU and the PMA.

By the averaging provisions contained in section 1301 *et seq.*, Congress has provided some tax relief for taxpayers who receive unusually large amounts of income in a single taxable year. From the evidence in this case, we cannot determine whether the additional income received by the petitioner as a result of the distributions under the vesting benefit trust qualify him for relief under such provisions. If such provisions are applicable, they should be applied in a Rule 50 computation.

In addition to the lack of funding of the vesting benefit trust, the respondent made several other arguments against the qualifications of the trust, but in view of our conclusion with respect to the funding issue, it is unnecessary for us to consider his other arguments.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

DRENNEN, *J.*, dissents.

_____

SCOTT, *J.* dissenting: I respectfully disagree with the conclusion of the majority that petitioner is not entitled to treat the $12,291.66 lump-sum payment he received from the Vesting Benefit trust in the year 1967 as gain from the sale of a capital asset held for more than 6 months.

The majority opinion in setting up the basis for its discussion states that whether petitioner is entitled to treat the payments which he received from the Vesting Benefit trust as long-term capital gain depends upon whether that trust was a part of a plan which meets the requirements of section 401. The opinion then states that the resolution of this issue necessitates considering two questions: (1) Must a plan qualifying under section 401 be funded, and (2) do the provisions of the 1966 agreement providing for vesting benefits establish a funded plan?

At the outset I take issue with the questions which must be considered as stated in the majority opinion. The question here is whether the sum received by petitioner in 1967 from the Vesting Benefit trust was taxable under section 402 [1] as having been received from "an

_____

[1] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST

    (a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

     *       *       *       *       *       *

    (2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other

**338**

employee trust described in section 401(a)." Section 401(a)[2] provides that a trust forming part of a pension plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust "if contributions are made to the trust by such employer * * * for the purpose of distributing to such employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with such plan."

separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. Where such total distributions include securities of the employer corporation, there shall be excluded from such excess the net unrealized appreciation attributable to that part of the total distributions which consists of the securities of the employer corporation so distributed. The amount of such net unrealized appreciation and the resulting adjustments to basis of the securities of the employer corporation so distributed shall be determined in accordance with regulations prescribed by the Secretary or his delegate. This paragraph shall not apply to distributions paid to any distributee to the extent such distributions are attributable to contributions made on behalf of the employee while he was an employee within the meaning of section 401(c)(1).

[2] SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

(1) if contributions are made to the trust by such employer, or employees, or both, or by another employer who is entitled to deduct his contributions under section 404(a)(3)(B) (relating to deduction for contributions to profit-sharing and stock bonus plans), for the purpose of distributing to such employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with such plan;

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries;

(3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

(A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or

(B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees; and

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

(5) A classification shall not be considered discriminatory within the meaning of paragraph (3)(B) or (4) merely because it excludes employees the whole of whose

Section 401(a)(2) through (8) sets forth various other criteria which must be satisfied by the trust and by the plan of which the trust forms a part in order for the trust to be a qualified trust under section 401. None of these other sections deals with payments or contributions to the trust.

In this case respondent questioned whether the trust created by the Mechanization Agreement of 1966 met certain of the qualifications set forth in section 401(a)(2) through (8) and whether the plan of which the trust formed a part met certain of these qualifications. The majority opinion, concluding as it does that the trust does not as it must to

---

remuneration constitutes "wages" under section 3121(a)(1) (relating to the Federal Insurance Contributions Act) or merely because it is limited to salaried or clerical employees. Neither shall a plan be considered discriminatory within the meaning of such provisions merely because the contributions or benefits of or on behalf of the employees under the plan bear a uniform relationship to the total compensation, or the basic or regular rate of compensation, of such employees, or merely because the contributions or benefits based on that part of an employee's remuneration which is excluded from "wages" by section 3121(a)(1) differ from the contributions or benefits based on employee's remuneration not so excluded, or differ because of any retirement benefits created under State or Federal law. For purposes of this paragraph and paragraph (10), the total compensation of an individual who is an employee within the meaning of subsection (c)(1) means such individual's earned income (as defined in subsection (c)(2)), and the basic or regular rate of compensation of such an individual shall be determined, under regulations prescribed by the Secretary or his delegate, with respect to that portion of his earned income which bears the same ratio to his earned income as the basic or regular compensation of the employees under the plan bears to the total compensation of such employees.

(6) A plan shall be considered as meeting the requirements of paragraph (3) during the whole of any taxable year of the plan if on one day in each quarter it satisfied such requirements.

(7) A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable. This paragraph shall not apply to benefits or contributions which, under provisions of the plan adopted pursuant to regulations prescribed by the Secretary or his delegate to preclude the discrimination prohibited by paragraph (4), may not be used for designated employees in the event of early termination of the plan.

(8) A trust forming part of a pension plan shall not constitute a qualified trust under this section unless the plan provides that forfeitures must not be applied to increase the benefits any employee would otherwise receive under the plan.

(9) In the case of a plan which provides contributions or benefits for employees some or all of whom are employees within the meaning of subsection (c)(1), a trust forming part of such plan shall not constitute a qualified trust under this section unless, under the plan, the entire interest of each employee—

(A) either will be distributed to him not later than his taxable year in which he attains the age of 70½ years, or, in the case of an employee other than an owner-employee (as defined in subsection (c)(3)), in which he retires, whichever is the later, or

(B) will be distributed, commencing not later than such taxable year, (i) in accordance with regulations prescribed by the Secretary or his delegate, over the life of such employee or over the lives of such employee and his spouse, or (ii) in accordance with such regulations, over a period not extending beyond the life expectancy of such employee or the life expectancy of such employee and his spouse. A trust shall not be disqualified under this paragraph by reason of distributions under a designation, prior to the date of enactment of this paragraph, by any employee under the plan of which such trust is a part of a method of distribution which does not meet the terms of the preceding sentence.

be qualified form a part of a "funded plan," does not reach these contentions of respondent.

In my view for reasons which could be detailed, none of respondent's objections to the trust or the plan of which it forms a part as failing to meet the requirements of section 401 (a) (2) through (8) are valid, but since the majority opinion does not reach these other issues I will not discuss them further.

The majority opinion discusses funded plans in general and not specifically the question whether the trust here involved is one to which the employers who created the trust as part of a pension plan made contributions for the purpose of distributing to their employees or their beneficiaries the corpus and income of the fund accumulated by the trust. There are, of course, other qualifying pension plans provided for in other sections of the Code such as the custodial account provided for in section 401 (f). However, here we are not concerned with those plans.

The majority opinion, relying on Rev. Rul. 71–91, 1971–1 C.B. 116, and Rev. Rul. 69–421, 1969–2 C.B. 59,[3] concludes that respondent seems to use the word "funded" to describe the accumulation of contributions

---

[3] Rev. Rul. 71–91, 1971–1 C.B. 116:

A corporate employer established a noncontributory pension plan providing for a normal retirement benefit of $100 per month, for each employee upon his retirement after the attainment of age 65. The plan provides that no contributions will be made on behalf of any employee prior to retirement. At retirement the employer will pay the monthly pension directly to the retiree. This type of arrangement is sometimes referred to as a "pay as you go" plan.

A plan may meet the requirements of section 401(a) of the Code only if contributions are used to establish a trust of the type described in that section or to establish a custodial account of the type described in section 401(f) of the Code. For the purposes of sections 403(a) and 404(a)(2) of the Code, contributions may be used for the purchase of an annuity contract of the type described in those sections. Furthermore, for the purposes of sections 401, 402, 403, and 404 of the Code, contributions may be used for the purchase of face-amount certificates of the type described in section 401(g). In addition, in the case of bond purchase plans, contributions may be used for the purchase of retirement bonds of the type described in section 405(b) of the Code.

All of these plans are funded arrangements. Thus, a qualified plan must be a funded plan. It may not provide for direct payments by an employer to his employees, as in the case of the pay-as-you-go pension plan described in this case.

Rev. Rul. 69–421, 1969–2 C.B. 59, 62:

(b) FUNDED PLANS.—A qualified plan must be a funded plan. Contributions may be made to a trust or under a custodial account, or may be used to pay premiums on insurance contracts, or to purchase face-amount certificates or used to buy retirement bonds. A qualified plan does not provide for direct payments by an employer to his employees, as in the case of a pay-as-you-go pension plan. However, employer contributions to or under a recognized funding medium may, under appropriate circumstances, be delayed pursuant to an established funding method. Thus, a qualified pension plan may provide that current contributions be made by employees only, but that the employer is obligated to pay the full amount of the stipulated benefits to each retired employee-participant after the funds in the trust forming a part of such plan have been fully exhausted. See Rev. Rul. 54–152, C.B. 1954–1, 149. The employer may also make contributions in any year to substitute for the otherwise required employee contributions. Rev. Rul. 68–25, 1968–1 C.B. 151. It should be observed, however, that minimum funding requirements must be maintained even if contributions are made by employees only. See part 6(d) hereof.

to an entity beyond the employer's control and prior to the payment of benefits. After citing a number of articles which deal with various suggestions for deferred compensation plans which will meet the requirements to receive approval by the Internal Revenue Service for deductibility of contributions, the majority opinion concluded that the term "funded" will be used in the opinion to mean the accumulation of funds in a person independent of the employer. Used in that sense, my primary disagreement with the majority opinion is in its interpretation of the very lengthy and detailed Mechanization Agreement and particularly its provisions for accumulation and distribution of funds to the trusts created in connection with the agreement. In my view if we conclude that the combination of the provisions of the Mechanization Agreement and the trusts created as a part thereof provide for contributions to the trust by the employers for the purpose of distribution to the employees or their beneficiaries of the corpus of the fund accumulated by the trust, we must hold the trust here involved to be a qualified trust. This might be considered to be in a sense the requirement the majority opinion envisions when it uses the phrase, "the accumulation of the funds in a person independent of the employer."

Certainly the revenue rulings cited in the majority opinion, which deal with a corporate employer's establishing a plan whereby payments are made to the employee directly upon his retirement, do not resolve the issue here involved even if they are accepted as a correct statement of the law. Because of the numerous employers who are members of PMA and the numerous employees who are represented by the union but who work for the various employers, the establishment of a Vesting Benefit trust to give an extra pension to these employees primarily upon early retirement and for periods of 4 or 5 years necessitated a more complicated procedure for collection of contributions than direct payments by the employers to the trust. For this reason it is necessary to consider all the numerous provisions of the agreement in determining whether the trust had a corpus to be distributed within the meaning of section 401(a)(1). The complication of this plan was discussed at some length by the Supreme Court in *Volkswagenwerk* v. *FMC*, 390 U.S. 261 (1968). Actually the plan there under consideration was the 1961 plan which, as the Supreme Court noted at page 264, was in effect continued by the 1966 plan. The 1961 plan together with all of its amendments is in evidence in this case and insofar as it bears on the issue with which we are here concerned is substantially the same as the 1966 plan. The Supreme Court in that case pointed out, at page 277, that the agreement levied $29 million over 5 years and bound all principal carriers, stevedoring contractors, and

terminal operators on the Pacific Coast. It referred to the agreement as specifically reserving to PMA alone the right to determine how to raise the Mechanization Fund from the members at the rate of some $5 million per year (p. 264). The *Volkswagenwerk* v. *FMC* case dealt with whether the method of placing an assessment on the automobiles which were imported by Volkswagenwerk on chartered vessels which were not common carriers was fair to the company. Volkswagenwerk had alleged that PMA was dominated by common carriers and had agreed upon an assessment formula to shift a disproportionate share of the Mechanization Fund onto companies which did not patronize those common carriers. Justice Harlan, in his concurring opinion (p. 287), stated:

> The assessment agreement was, of course, consequent upon the labor agreement committing PMA to raise the fund. The union side was concerned with a guarantee that the fund would be raised somehow, and the labor agreement guaranteed only that much. But whenever any multi-employer bargaining unit agrees to provide benefits for employees there arises a problem of how to allocate the costs among the various employers and (in consequence) among their customers.

It is clear that much of the complication of the Mechanization Agreement arose because of the purpose of that agreement as discussed by the Supreme Court to absolutely guarantee a payment in the 1961 agreement of $29 million and in the 1966 agreement of $38 million into the Mechanization Fund for the benefit of the employees of the various members and principals of PMA but because PMA was to arrange the nature of assessments, to have many safeguards written into the plan. The plan provided primarily for a total collection of $7.4 million per year for a 5-year period. It did permit PMA, based on reports of the trustees of the Vesting Benefit trust and welfare fund, to alter somewhat the rate of collection of this $38 million. However, it was absolutely clear that this was merely an alteration of the rate and not of the total amount which the employers were required to pay into the Mechanization Fund. The agreement provided in this respect:

> 5.32. The provisions of Paragraphs 5.3 and 5.31 hereof [permitting adjustments in the rate of collection under certain circumstances] shall not be construed either as requiring the Member Companies to accumulate under this Agreement more than a total of Thirty Eight Million Fifty-Three Thousand Three Hundred and Eight and Forty-One-Hundredths Dollars ($38,053,308.40) in the Mechanization Fund or as relieving the Member Companies from accumulating in the Mechanization Fund less than said total sum and, if said total sum has not been accumulated and transferred to the respective trusts to be employed for effectuation of the Plan by June 30, 1971, or when payment of the last death, disability and vesting benefit to an Employee, or his Designee, has been made or provided for hereunder, whichever date is later, the balance of said total shall be accumulated in the Mechanization Fund and used as the Union and Association may then mutually agree.

5.33. Whenever conditions require the Association to exercise the powers granted to it by Paragraphs 5.3, 5.31 and 5.32 hereof, the Association shall at all times inform the Union as to the provisions which the Association intends to make or has made to provide for the collection in the future of such portion of the annual Contributions to the Mechanization Fund which has been deferred by reason of exercise of such powers.

It is therefore absolutely clear from this agreement that a total payment of $38 million was required to be made and no part of that amount could be used except for the benefit of the employees of the various members and principals of PMA. The agreement makes it absolutely clear that the employers who are member companies of PMA are to make contributions at the rate set forth in paragraphs of the agreement governing rate of accumulation and providing for the accumulation of the entire $38 million over the 5-year period. It then provides that employers who are not member companies of the association shall contribute to the Mechanization Fund at comparable rates and in a like fashion as other employers under an arrangement to which the association and union consent in writing. It then carries the following provisions with respect to interest in the Mechanization Fund:

2.4. *Interests in Mechanization Fund:* Neither the Union nor Employees shall have any right, title or interest, or any claim whatsoever, legal or equitable, in or to any portion of the Mechanization Fund.

2.41. No Trustee of any Trust employed for the effectuation of the Plan, or any beneficiary thereof, shall have any right, title or interest, or any claim whatsoever, legal or equitable, in or to any portion of the Mechanization Fund, except as is specifically set forth in and granted under this Agreement or any such respective Trust.

2.42. The Association's status, including its right, title and interest, respecting the Mechanization Fund or any portion thereof, shall be only as a collecting agent for the various Employers making Contributions thereto for transferral to the respective Trusts, employed for effectuation of the Plan, of all or any portion of the Mechanization Fund coming into its possession in the form of Contributions.

2.43. No Employer, or its successor in interest, shall have any right, title or interest, or any claim whatsoever, legal or equitable, with respect to Contributions to the Mechanization Fund within the possession of the Association which were made by another Employer, and the interest of an Employer, or its successor in interest, in the Mechanization Fund shall be limited to that pro rata portion thereof attributable to Contributions made by it, computed on a "first-in, first-out" principle, and which have not already been transferred by the Association to the respective Trusts employed for the effectuation of the Plan.

The majority opinion apparently relies to an appreciable extent on the statement that the association's interest in the fund shall be only as collecting agents for the various employers making contributions thereto for transfer to the respective trusts employed for the effectuation of the plan and on the provision in paragraph 2.43 which

344

suggests some remaining interest of the employers in contributions made which are within the possession of the association. However, a reading of the entire agreement requires the conclusion that paragraph 2.43 has no reference to payments made by PMA member companies plus collections from nonmembers except where some other provision of the trust would permit some return of payments. While paragraph 2.5 of the agreement provides for abatement of payments in the event of unauthorized work stoppages, the only provision allowing a return of funds by PMA to employers is the provision of paragraph 6.6 of the agreement. This paragraph reads as follows:

6.6. *Tax Rulings:* The parties hereto have entered into this Agreement and amendments thereto and established the various Trusts provided for hereunder in reliance on the letter rulings dated September 15, 1961, of the Internal Revenue Service, and on their applicability to all Member Companies, to the effect that the Employers may take a tax deduction from gross income for their respective Contributions paid to the Association for the Mechanization Fund effective with the transfer by the Association from the Mechanization Fund of the same to the respective trusts to be employed for effectuation of the Plan, and to the effect that Principals may take a tax deduction from gross income for payments made by them to Employers on account of such Contributions in the year such payments are made or the responsibility to make such payments is incurred. If either of said tax consequences is defeated or nullified by construction, amendment, revision, or revocation of said rulings or by any other event whatsoever, the obligations under Article II hereof of the Association and its Member Companies to continue to accumulate the Mechanization Fund and of Employers to pay further Contributions to the Mechanization Fund shall be immediately suspended and the Association may make appropriate refunds to the respective Employers of their Contributions then held by the Association in the Mechanization Fund. Such obligations shall not be revised until and unless during the term of this Agreement the Member Companies shall have obtained a further effective ruling of the Internal Revenue Service reaffirming said tax consequences or until and unless an equivalent effective assurance of said tax consequences is obtained, either or both in a form satisfactory to the Association in its sole, absolute and unreviewable discretion. The Union agrees to assist the Association and Member Companies in obtaining such further ruling or equivalent assurance.

However, this Court and other courts have consistently held that a trust or plan was not disqualified merely because retention of the payment by the trust or plan was contingent on the approval or qualification of the plan by the Internal Revenue Service. *555, Inc.,* 15 T.C. 671, 673 (1950); *Meldrum & Fewsmith, Inc.,* 20 T.C. 790, 806 (1953); *Surface Combustion Corporation,* 9 T.C. 631, 654, 655 (1947), affd. 181 F. 2d 444 (C.A. 6, 1950). In affirming our holding in *Surface Combustion Corporation,* the Sixth Circuit stated:

We also reject the Commissioner's contention that the taxpayer had not irrevocably parted with the funds, since they would be returned to it if the contributions were ultimately held to be nondeductible. Such a contingency was entirely within the control of the Commissioner. So far as the taxpayer was concerned, the payments were irrevocable by it. *Oxford Institute,* 33 B.T.A. 1136.

For several years prior to March 1, 1945 the Commissioner approved profit sharing and pension plans and allowed deductions therefor where such payments were so conditioned. Montgomery, Federal Taxes, Vol. 1, p. 533, 1948–1949 Edition.

The agreement as a whole is clear that funds once transferred to PMA are outside the control of the contributors except for the one contingency set forth in paragraph 6.6 heretofore quoted. Paragraph 2.43 of the agreement even limits the rights of employers to recover their payments to PMA under this contingency. The agreement also makes it clear that the trusts have a definite interest in the funds in the hands of PMA. The trust agreement provides in this respect:

4.5. *Powers and Duties of Trustees:* The Trustees of each of the aforementioned Trusts may demand payment by the Association from Contributions received by it for the Mechanization Fund of such moneys to which the Trusts under their respective administrations may be entitled under this Agreement and may proceed at law or equity to enforce such demand if the Association fails to make any such payment within a reasonable period.

4.51. The Trustees of each of said respective Trusts are hereby empowered to enforce the rights derived hereunder by the Trust under their respective administrations against any Employer or Principal to the extent that the Association certifies to such Trustees that an Employer or Principal is in default of its obligations or responsibilities under the Plan, and such Trustees may proceed at law or equity or under the bankruptcy laws to enforce such rights.

These rights of the trustees in the fund are substantial and are part of the rights "specifically set forth in and granted" under the agreement referred to in paragraph 2.41 of the agreement heretofore quoted.

In my view considering the agreement as a whole calls for the conclusion that the funds held by PMA which had been collected from the employers were held for the benefit of the trusts created as part of the Mechanization Agreement and formed the corpus of those trusts.

PMA was obligated to collect over basically a 5-year period the total of $38 million, none of which sum would ever revert to the employers, except on a contingency which we have consistently held not to disqualify the trust. See *William D. O'Brien*, 46 T.C. 583 (1966), where we again reaffirmed our holding in *Surface Combustion Corporation*, *supra*, and quoted at length from our opinion in that case. Each payment made by an employer to PMA was placed outside the employer's control and the total payments were $38 million. It is also clear from the agreement as a whole that PMA would always have and be holding some funds for transfer to the trust and that each trust could enforce the transfer of the funds to it. Therefore, in my view, even though the agreement refers to PMA as being appointed the "collecting agent acting for and on behalf of employers in accumulating their respective contributions to the Mechanization Fund" and further refers to PMA as "a conduit for transferring the whole or portions of the Mechanization Fund received by it to the respective

trusts employed for effectuation of the plan," it is clear that PMA also held, and by the agreement was required to hold, the funds collected by it for transfer to the trusts. In my view the provisions of the Mechanization Agreement properly interpreted show that once PMA had collected the funds, and was holding such funds for the benefit of the trusts, PMA was not authorized to use the funds for any purpose but transfer to the trusts. Therefore, in my view, the funds being held by PMA were contributions to the trusts by employers for the purpose of distributing to employees or their beneficiaries the corpus of the fund accumulated on behalf of the trusts. I agree with petitioner's statement in his brief that PMA "holds the funds in trust for the purpose of the Trust Indenture." In a number of cases we have recognized an employee pension trust as qualified because of its having a corpus when the facts showed less clearly than here a fund accumulated for the trust.

The majority opinion disposes of such cases as *Tallman Tool & Machine Corporation*, 27 T.C. 372 (1956), by stating that the issue in such cases was not whether the trust was a qualified trust under section 401. In *Tallman Tool & Machine Corporation, supra*, we held that a promissory note of the employer provided the trust there involved with a corpus during its fiscal year ended September 30, 1952, the demand promissory note having been delivered to the trust on September 30, 1952. The taxpayer in that case was an accrual basis taxpayer which had deducted an amount paid in cash to the trust in the following calendar year for its fiscal year ended September 30, 1952. Although the opinion dealt with whether the trust had a corpus so as to be a legal trust in its fiscal year 1952, the ultimate question necessarily was whether the trust qualified so as to permit the deduction. Certainly if a promissory note for $20,000 is sufficient to constitute the corpus of a trust, a binding obligation on employers to pay $38 million is sufficient to constitute such corpus. The agreement provides for transfer by PMA to the trusts of the funds which are to be paid out by the trusts to employees or their beneficiaries, the transfer being of all or portions of the $38 million of payments collected by PMA from the employers for the trusts. Therefore, contributions made to the trusts by the employers were made for the purpose of distributing to employees the corpus of the fund accumulated by the trusts. Before the trusts paid out the funds, they had to accumulate the funds. Accepting the definition of the majority of a "funded plan" the trusts here involved provided for a funded plan.

Since PMA acted as the collecting agent for employers for funds to be turned over to the trusts, there are some aspects of the agreement which give a superficial indication of a pay-as-you-go pension plan.

However, it is certainly not the direct pay-as-you-go plan referred to in respondent's revenue ruling to which the majority appears to equate it. Here there was a qualified trust which made the payment to petitioner. The trustees of that trust made the decision of whether the employee was entitled to receive his pension where such a question arose and decided which employees might receive a lump-sum payment. Under the plans referred to in the revenue rulings and to which the majority equates the situation in this case, the employer decides who will receive payment under the plan. The distinction between a pay-as-you-go pension plan and the facts in this case is that here we have the qualified trust referred to in section 402(a)(2). Also, under the pay-as-you-go plans, the employer assumes no liability and makes no payment until the employee retires. Here, the employers made an absolute and unconditional commitment to the payment of $38 million for the benefit of the two trusts. The system of collection was left to PMA. In fact the origination of the case of *Volkswagenwerk* v. *FMC*, *supra*, was set forth by the Supreme Court as follows:

> The petitioner [Volkswagenwerk] refused to pay any additional charge resulting from the Association's [PMA's] levy, and Terminals [a PMA member who had contracted to unload Volkswagenwerk's cars], while continuing to unload Volkswagen automobiles for the petitioner, did not pay its resulting assessment to the Association. The Association sued Terminals in a federal court in California for its failure to pay the Mech Fund assessments; Terminals admitted all the allegations of the complaint and impleaded the petitioner as a defendant. The petitioner then obtained a stay of that action to permit it to invoke the primary jurisdiction of the Federal Maritime Commission, in order to determine the following issues:

The issues brought before the Maritime Commission dealt with whether the assessments as levied by PMA were subject to approval by the Maritime Commission, whether these assessments discriminated against Volkswagenwerk, and whether the assessments claimed from Volkswagenwerk constituted an unreasonable practice as compared to assessments from association members.

If the payments by PMA members and principals were payments which the employers could obtain back as in the case of a reserve fund, there would have been no requirement that the payments be made by Volkswagenwerk and Terminals as Volkswagen cars were unloaded, and the entire Supreme Court case would have been moot. A reasonable interpretation of the entire Mechanization Agreement does not in my view support the final conclusion on which the majority opinion is based, that the effect of the arrangement between employers and PMA under the Mechanization Agreement was as if the employers merely set aside the funds in a reserve account which they maintained.

In fact the whole agreement is geared to just the opposite result, that of binding the employers as a whole to an unequivocal payment of $38 million over a 5-year period but leaving the method of specific assessment of each employer's prorata share to a formula selected by PMA. Certainly, because of leaving the method of collection and proration of assessments to the discretion of PMA, the provisions of the agreement are complicated. However, in my view the Vesting Benefit trust did have a corpus and was a qualified trust under section 401(a) so that petitioner properly reported his lump-sum payment received in 1967 as gain from a capital asset held for more than 6 months.

The majority concludes its opinion by disposing of petitioner's argument that since the employers are allowed to deduct their contributions to the Vesting Benefit trust, the employees should be allowed capital gain treatment with the statement that "there are situations in which an employer may deduct his contributions to a pension plan even though it does not qualify under section 401. See sec. 404(a)(5)."

In my view the inference from the recitation of the ruling of the Internal Revenue Service set forth in paragraph 6.6 heretofore quoted is that the trust was a qualified trust. However, I agree that such a holding by the Revenue Service in case of the employer does not as a matter of law bind respondent to accord comparable treatment to the employee. It is, however, bothersome to find an agreement which can be held to provide favorable tax treatment to everyone except the employees for whose benefit it was created.

Furthermore, the fact that respondent distinguishes in his ruling between employers and principals and permits the former a deduction only when PMA transfers funds to the trusts but allows the latter to deduct these contributions when payment is made does not require a conclusion that such treatment is correct. Apparently both the employers and PMA were satisfied with the ruling they received from the Internal Revenue Service as to deductions of contributions to the Mechanization Fund.[4] If the issue were before us, we might well hold that the contributions were deductible by the employers when paid to PMA. This issue is not before us and I do not feel it necessary to decide it. However, in my view petitioner properly treated his payment in 1967 from the Vesting Benefit trust as capital gain.

FAY, HOYT, IRWIN, and GOFFE, *JJ.*, agree with this dissent.

---

[4] Par. 3.3 of the Mechanization Agreement provides that PMA is authorized "to take all reasonable action necessary to compel Employers and Principals who are Member Companies to comply with their respective obligations or responsibilities under the Plan." Apparently from the origin of *Volkswagenwerk* v. *FMC*, 390 U.S. 261 (1968), this included suing a defaulting employer. A collection suit against an employer could hardly be considered as the act of an agent for that employer.